FORM TO BE USED BY FEDERAL PRISONERS FILING A PETITION
FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

# IN THE UNITED STATES DISTRICT COURT FOR THE

## MIDDLE DISTRICT OF PENNSYLVANIA      DIVISION

DEMETRIOS KOUKOULOMATES   REG.NO.: 08916-026

LOW SECURITY CORRECTIONAL INSTITUTION - ALLENWOOD

POST OFFICE BOX  1000

WHITE DEER, PA 17887
(Name, prison number, and address or
place of confinement of Petitioner),
DEMETRIOS KOUKOULOMATES
                    Petitioner,

**FILED
SCRANTON**

JAN 3 0 2003

PER ___ DEPUTY CLERK

vs.

SUSAN GERLINSKI,: et al.
        Respondant/Government

**3: CV 03 0186**

Case Number
(To be assigned by Clerk)

SUSAN GERLINSKI: WARDEN of

LOW SECURITY CORRECTIONAL INSTITUTION-ALLENWOOD

P.O. BOX 1500

WHITE DEER, PA 17887
(Name of warden or other official
having custody of Petitioner),

                    Respondent.

## HABEAS APPLICANTS MUST COMPLETE THIS ENTIRE FORM

PLEASE COMPLETE THE FOLLOWING (check where applicable):

1.  This petition concerns:

    (a)    __X__  a conviction

    (b)    _____  a sentence

    (c)    _____  jail or prison conditions

    (d)    _____  prison discipline

    (e)    _____  parole

    (f)    __X__  other (explain) _Treaty Violation_

2.  Provide the following information regarding the conviction(s) and sentence(s) for which you are presently incarcerated:

    (a)    Name(s) and location(s) of court: FEDERAL DISTRICT COURT for the CENTRAL DISTRICT OF ILLINOIS 312 FEDERAL BLDG., 210 NORTH VERMILLION, DANVILLE, ILL. 618 or CLERK BOX 315, SPRINGFIELD, ILL. 62705

    (b)    Case number(s): _____90-30072_____

    (c)    Nature of the charge(s) for which you were convicted: Title 21 Section 841(a)(1) and 846 CONSPIRACY TO DISTRIBUTE COCAINE

    (d)    The conviction followed your plea of _X_ guilty, ___ not guilty, or ___ nolo contendere.

(e)  Did you appeal the conviction or sentence?

___ Yes, _X_ No.  If yes, state the date, outcome, and number

assigned to the appeal:

_____

_____

_____

3.  Are you currently represented by counsel in this case or any

other court case?  ___ Yes, _X_ No.

4.  In the spaces below, set forth every ground which supports

your claim that you are incarcerated unlawfully.  Briefly

summarize the specific facts in support of each ground raised,

and provide the information regarding exhaustion under your

summary of facts.  You may attach additional pages, if necessary.

Conclusions which are not supported by specific facts are

insufficient.  Do not cite any law in your statement of facts.

> CAUTION:  An application for writ of habeas corpus by a
> prisoner authorized to apply for relief by motion under
> 28 U.S.C. § 2255 will not be entertained by the court
> unless it appears that the remedy by § 2255 motion is
> inadequate.  Therefore, IF any of the grounds raised
> below challenge the validity of your conviction or
> sentence as imposed by the sentencing court, YOU MUST
> COMPLETE ITEM 5.  If they do not, you may skip item 5.

(a)  GROUND ONE: **VIOLATION OF PETITIONER'S VIENNA CONVENTION RIGHTS ON CONSULAR**

**NOTIFICATION.** SEE ATTACHED MEMORANDUM OF LAW FOR A MORE COMPLETE DISCUSSION OF THE

PRINCIPLES OF LAW INVOLVED. MEMORANDUM OF LAW IS HEREBY INCORPORATED BY REFERENCE AS

IF SET FORTH HERE AT LENGTH WITH THE SAME FORCE THERE AT.

SUPPORTING FACTS: **TOOK TEN AND ONE HALF YEARS AFTER ARREST BEFORE PETITIONER FOUND OUT ON HIS OWN ABOUT HIS VIENNA CONVENTION RIGHTS ON CONSULAR NOTIFICATION.**

EXHAUSTION:  Have you presented ground two to the Bureau of Prisons, or in any other administrative or judicial proceeding? ___ Yes, **X** No.  If yes, provide the number(s) assigned to the proceeding, the result(s), and the date(s) of the result(s) of that proceeding, including any appeals:

(c)  GROUND THREE: **VIENNA CONVENTION ON CONSULAR NOTIFICATION VIOLATION CAUSED A CHA OF EVENTS TO OCCUR THAT VIOLATED PETITIONER'S 5thAMENDMENT AND 6th AMENDMENT RIGHTS TO VIOLATED MANY TIMES.** SEE ATTACHED MEMORANDUM OF LAW FOR A MORE COMPLETE DISCUSSION OF THE PRICIPLES OF LAW INVOLVED. MEMORANDUM OF LAW IS HEREBY INCORPORATED BY REFERENCE AS IF SET FORTH HERE AT LENGTH WITH THE SAME FORCE THERE AT.

SUPPORTING FACTS: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

EXHAUSTION:  Have you presented ground three to the Bureau of

Prisons, or in any other administrative or judicial proceeding?

___ Yes,  X  No.  If yes, provide the number(s) assigned to the

proceeding, the result(s), and the date(s) of the result(s) of

that proceeding, including any appeals:

_____

_____

_____

_____

_____

   (d)   GROUND FOUR: ALL GROUNDS ARE HEREBY INCORPORATED BY REFERENCE IN THE ATTACHED

MEMORANDUM OF LAW AS IF SET FORTH HERE AT LENGTH WITH THE SAME FORCE THERE AT.

_____

_____

SUPPORTING FACTS: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

EXHAUSTION:  Have you presented ground four to the Bureau of

Prisons, or in any other administrative or judicial proceeding?

___ Yes, _X_ No.  If yes, provide the number(s) assigned to the

proceeding, the result(s), and the date(s) of the result(s) of

that proceeding, including any appeals:

_____

_____

_____

_____

_____

_____

5.   If any of the grounds raised above challenge your conviction

or sentence imposed by the sentencing court:

     (a)    Explain in the space below why your remedy under 28

U.S.C. § 2255 is inadequate or ineffective to test the legality

of your detention:

MY CLAIM IS ON A TREATY VIOLATION AND THE CAUSE AND EFFECT OF SAID VIOLATION. EVEN

THOUGH THE UNITED STATES GOVERNMENT AND ALL OFFICERS OF THE COURT HAD AN OBLIGATION

TO ADVISE ME OF SAID TREATY RIGHTS, I FOUND OUT ON MY OWN AFTER TEN AND ONE HALF YEARS

OF INCARCERATION: MANY YEARS AFTER I FILED MY § 2255.

     (b)    State whether you have ever filed a § 2255 motion, and

the result:

I FILED A § 2255 IN THE EARLY 1990's ON DOUBLE JEOPARDY AND WAS DENIED

6.   WHEREFORE, based on the grounds raised above, Petitioner

prays that the court will grant the following relief:

R E V E R S A L   O F   C O N V I C T I O N

BP-A757.013
AUG 2002

**INMATE REQUEST FOR CERTIFICATION OR JUDICIAL NOTICE OF**

**PRESENTENCE REPORT AND/OR STATEMENT OF REASONS**

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

**TO THE CLERK OF COURT:** This form is filed as an ATTACHMENT to my pleading in the following current cause of appeal (indicate current case caption, docket no., judicial district, etc.):

My current cause of action or appeal is (check all that apply) :

☐ A direct appeal of my original criminal conviction of sentence (filled with the U.S. Court of Appeal);

☐ An original petition for writ of habeas corpus pursuant to title 28 USC §2255, or appeal of its denial, regarding my criminal conviction or sentence (filled with sentencing court or U. S. Court of Appeals); or

☒ Other, e.g., §2241 habeas petition; Privacy Act of 1974 (5 USC §552a), etc. (describe): § 2241 habeas peti

As part of my current cause of action or appeal, I request the court consider my Presentence Report (PSR) and Judgement (including State of Reasons (SOR)), where necessary, from my **Underlying criminal case**, described as follows (indicate underlying criminal case caption, docket no., judicial district, sentencing judge and date, etc.):

**This form is for informational and notification purposes, and is not intended to create a new procedural requirement for inmates, courts, or clerks.**

Respectfully submitted:

| Inmate Signature | Inmate Printed Name |
|---|---|
| *Demetrios Koukoulates* | Demetrios, KOUKOULOMATES |

| Reg. No. | Date Signed | Institution Address |
|---|---|---|
| 08916-026 | 1-21-03 | Federal Correctional Institution P.O. BOX 1000 White Deer, PA. 17887 |

**DIRECTION TO INMATE:** The bureau of prisons prohibits inmate from possessing copies of their Presentence Reports (PSR) or Statement of Reasons (SOR) from criminal judgements. This form is for you to **ATTACH** to any court action where, as part of your case of action or appeal, you request the court to consider your PSR or SOR. Complete this form as indicted, and submit it as an **ATTACHMENT** to your pleading to the court considering your current cause of action or appeal. This form is not a pleading, but an **ATTACHMENT** requesting the court obtain and consider your PSR and/or SOR when needed. You only need this form when your cause of action involves the PSR or SOR. Be sure to indicate in your pleading the specific part(s) of the PSR or SOR your believe relevant to our case.

**(this form may be replicated via WP)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DEMETRIOS KOUKOULOMATES

Petitioner

- versus -

UNITED STATES OF AMERICA
AND
FEDERAL BUREAU OF PRISONS
THRU
SUSAN GERLINSKI; WARDEN
Respondant

**FILED
SCRANTON**

JAN 3 0 2003

PER _____
DEPUTY CLERK

## PETITION FOR A WRIT OF HABEAS CORPUS BY A
## PERSON IN FEDERAL CUSTODY PURSUANT TO
## 28 U.S.C. § 2241

C I V I L   A C T I O N   N O . _____

Prepared and Submitted this 28TH Day of January, 2003

By: DEMETRIOS KOUKOULOMATES
    REG. NO.: 08916-026
    L.S.C.I. Allenwood
    Post Office Box 1000
    White Deer, PA 17887

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF Pennsylvania

DEMETRIOS KOUKOULOMATES,
      Defendant/Petitioner

Civil Action No: _____

vs.

SUSAN GERLINSKI; WARDEN, et. al.,
      Respondent

FILED
SCRANTON

JAN 3 0 2003

PER _____ DEPUTY CLERK

---

## MEMORANDUM OF LAW IN SUPPORT OF 28 U.S.C. § 2241
## WRIT OF HABEAS CORPUS

---

     DEMETRIOS KOUKOULOMATES, "Petitioner", pro se, and does submit and file this "Memorandum of Law" in support of 28 U.S.C. §2241 Writ of Habeas Corpus, file in the above entitled and numbered case, for an order vacating sentence and/or to set aside conviction. In support here of, Petitioner would urge this court to consider the following:

### 1. Preliminary Statement

     Petitioner avers that he is pro se and unlearned in The Law and therefore requests this court to liberally construe his pleadings, rather than to hold him to the same standards as an attorney, and decide them on their merits. **Haines v. Kerner**, 404 U.S. 519, 520 (1972).

### 2. Incorporation by Reference

     Petitioner hereby incorporates by reference his 28 U.S.C. § 2241 Writ of Habeas Corpus and all court files and proceedings in the above entitled case as if the same were set forth here at length with the same force there at.

### 3. Interested Parties

Honorable Richard Mills, United States District judge.

David Riseley, Assistant United States Attorney.

Susan Gerlinski, Warden of L.C.I. Allenwood.

Demetrios Koukoulomates, Petioner.

### 4. Parties Involved

**Petitioner** is presently incarcerated in the Low Security
Correctional Institution – Allenwwod, that has the address
of P.O. Box 1000, White Deer, PA. 17887. Petitioner is in
the custody of the Respondent.

**Respondent**, Susan Gerlinski, is the Warden of L.C.I. Allenwood
that has the address of, P.O. Box 1500, White Deer, PA. 17887.
Respondent is the HOLDER OF THE KEYS to Petitioner's liberty.

### 5. Jurisdiction and Venue

Petitioner is in the custody in a facility that is located
within the Court's Jurisdiction. Jurisdiction and Venue are
vested in this Court pursuant to **28 U.S.C. § 2241 (a).**

### 6. Remedy Requested

Petitioner requests this Court to Show Cause why Petitioner's
Conviction and Sentence are not in violation of the Constitution
of the United States of America and the Laws of the United States.

Petitioner requests this Court to give Order directing Respon-
dant to produce Petitioner before the Court for a hearing; or an
Order directing Respondent to **Release Petitioner.**

### 7. Exhaustion of Remedies

Petitioner never filed a Direct Appeal, but did file a
**28 U.S.C. § 2255** in the early 1990s. Petitioner's **28 U.S.C. § 2255**
was on **Double Jeopardy.**

## 8. Burden of Proof

Petitioner would like to point out to the Court that a Writ under 28 U.S.C. § 2241 is civil in nature and the burden of proof is the preponderance of the evidence.

## 9. Recharacterization of Petition

Petitioner avers that he has filed this petition pursuant to 28 U.S.C. § 2241 and requests that it be decided on its merits. Petitioner reminds the Court that due to the AEDPA of 1996, that courts are not to liberally construe motions, petitions, and things alike, without the consent of the moving party. See **Adams v. U.S., 155 F.3d. 582, 584 (2nd Cir. 1998)**

## 10. Statement of Case

Petitioner was arrested on 11-20-90. Petitioner was subsequently charged with T.21 Sec. 841(a)(1) and 846 under case number 90-30072. Petitioner pled guilty in front of District Court Judge Richard Mills and was sentenced on 9-16-91 by Judge Mills in the Central District of Illinois at 312 Federal Building, 210 North Vermillion, Danville, Ill. 61832. Petitioner never filed a Direct Appeal but did file a § 2255 in the early 1990's. Petitioner is still in custody but is schedualed to be realed soon and Removed to Athens Greece. All other pertinent information is not within Petitioner's possesion because of the restrictive B.O.P. policy concerning inmates possesion of "paperwork".

## 11. Discussion

Petitioner humbly submits this writ of § 2241 with complete confidence that under the provision for treaty violations set forth in § 2241 he has the right to proceed with such. Petitioner also believes that even though he is to be released soon, he still has

the right to pursue § 2241 as a vehicle for redress.

In the evening hours of November 20, 1990 Petitioner was arrested in a car with Louis Isirov (Case No. 90-30072-001) for attempting to sell a controlled substance (cocaine). David Karr (Case No. 90-30079-001) acting as a government informant pretending to be interested in purchasing from Louis Isirov a kilo of cocain, was chief architect of this reverse-sting operation.

Upon arrest law enforcement officers found in the car a package that weighed 1800 grams and tested "a possible weak positive" for cocain. In reality this package was 14 grams of cocain surrounded by common household drywall and about 32 ounces of Pepsi Cola® that was used to dissolve the 14 grams of cocain in a futile attempt to destroy all traces of drugs in the final moments before arrest.

Over a dozen heavily armed law enforcement officers were there to make the arrest. Both Petitioner and Louis Isirov were subsequently charged with 1800 grams of this counterfeit 'controlled substance' and additionally, weights that the government claimed were sold over a two year period prior to that fatefull date of arrest.

Petitioner and Louis Isirov eventually were taken to Havana County Jail; where they were placed in pretrial detention.

While in Havana Couty Jail Petitioner was never apprised of his Vienna Convention Rights on Consular Notification. It is this violation, of a clearly established International and U.S. statutory right that caused a harmful chain of events which led to Petitioner's 5th Amendment, 6th Amendment, 8th Amendment, and 14 Amendment rights being violated.

-4-

Petitioner's foremost and first argument concerns the violation of **Article** 36 of Petitioner's **Vienna Convention** rights regarding consular notification. These are rights the United States of America, under treaty, has pledged to abide by. In failing to honor these rights with Petitioner, this violation falls under the excepted rule allowing the submission of a Writ of Habeas Corpus under 28 U.S.C. §§ 2241.

All the additional arguments Petitioner brings to this court are offered to show the prejudicial effect of this treaty violation. The International Court of Justice has determined that Article 36 of the Vienna Convention is an individual right that cannot be procedurally defaulted in U.S. courts. Petitioner will show that he has suffered extreme legal prjudice at the hands of U.S. law enforcement officials, the Justice Department, and finally the courts due to the deliberate indifference of Petitioner's treaty rights.

Petitioner acknowledges that a §§ 2241 is not usually the vehicle that would include a 6th Amendment ineffective assistance of counsel claim. Nevertheless, Petitioner feels it is imperative that he be allowed to show the harmful effects of this treaty violation. Therefore, Petitioner humbly asks this Court to allow a 6th Amendment ineffective assistance of counsel claim because the prejudice Petitioner suffered was a direct result of a treaty violation.

It has taken Petitioner ten-and-one-half years since arrest and conviction, to discover his Vienna Convention rights. As a result Petitioner has lost all avenues of redress, other than those afforded under a Writ of Habeas Corpus under 28 U.S.C. §§ 2241.

Upon Petitioner's arrest he was taken to Havana County Jail for detention where he was allowed one fifteen minute phone call every Sunday evening. This restricted use of the phones lasted for many weeks. At no time in this period, or at any time thereafter, was Petitioner apprised of his Vienna Convention rights on Consular Notification. The United States State Department explicitly states that Petitioner had an undisputed right to call upon the consular officers of his embassy to assist him in a number of areas. One of these areas is the assisting of finding competent counsel to assist in the defense of their countryman. Because Petitioner was never told about his Vienna Convention rights, he was forced by the circumstances he found himself in, to locate and retain a defense attorney who had very little, if any, federal trial experience. Additionally, there was a conflict of interest with defense counsel, who had represented the main informant (Louis Isirov) in an unrelated state case a short time before the Federal arrests. Petitioner was not knowledgeable of the legal complexities but now believes his defense attorney entered the case with a bias against going to trial, where he would have to face, cross-examine, and try to impeach the credibility of a man who he still had an ethical obligation that comes with the attorney client privilege.

Petitioner can, if allowed, show that as a direct result of the Vienna Convention violation he suffered ineffective assistance of counsel.

The primary argument that Petitioner brings is one of treaty validity, official responsibilities in regard to a valid treaty, the proper method of executing these responsibilities, and International Law.

Petitioner's argument rests on the fact that he had an absolute International and Domestic right to be notified of his Vienna Convention rights (VCCR), which require mandatory notification of all foreign detainees. All 'Officers of the Court' shared a collective responsibility to adhear, and administer this obligation. There can be no divergence of intent, reason, and meaning between the Executive Branch, the Legislative Branch, the State Department and the Courts when it comes to treaty interpretation and execution. To allow such a state of disparity to exist puts an undue and unhealthy burden on the credibility of the Nation in the eyes of the International Community.

Once Petitioner was arrested his keepers had an official responsibility, within 72 hours of arrest, to make sure that Pettitioner had an understanding of his right to involve his Consulate Post in every aspect of his predicament. The circular the State Department sends out to law enforcement agencies every year is emphatic in its instructions to Federal, State, and Local Law Enforcement and other Officials regarding Foreign Nationals in the United States and the rights of Consular access.

The mere withholding and denial of Petitioner's VCCR rights begs the question of what else did the government and officers of the court withhold from Petitioner. Petitioner still questions whether the violation of his Consular Notification rights was endemic to him, or if the Violations were epidemic and systematically applied to all Foreign Nationals that were detained in Havana County Jail. This avenue of inquest raises the specter of Equal Protection considerations.

Article 36 of the Vienna Convention was ratified by Congress and signed by the President of the United States in good faith and expectations that there would be a vigilant observance of this agreement by those entrusted to be the sentinels of American Justice. To have the State Department, Congress, and the President of the United States promise in writing that all law enforcement officials of this Country will observe certain rights for all detained foreign nationals, and then to have the Justice Department backslide, distort, minimize, and obfuscate the issues of compliance, only futhers to distance other Nations' trust of American Treaties.

Petitioner believes that if this was truly a "Nation of the People, by the People, and for the People" then surely the first and foremost concern of the United States government would be for the safety of their citizens.

This includes all American Citizens who might find themselves travelling abroad. The very nature of Article 36 of the Vienna Convention bespeaks of Nations having an undisputed right to oversee, advise, and protest if necessary, a foreign national's treatment by the law enforcement apparatus of a detaining country.

This applies equally to americans travelling, for "American Interests", overseas. For this Nation to allow such a precious right to become weakened and diluted, is a grave betrayal of the Peoples' trust.

It doesn't take much of an imagination to foresee the horrors that can befall an American Citizen who is detained overseas; then having to face a criminal proceeding where the evidence is laid out in "a light most favorable to the prosecution", without the immediate assistance of the United States State Department! This would be a travesty allowed. It doesn't make sense to have a

Country like the United States, who supposedly advocates humane treatment of people, to just blatantly disregard its contractual responsibility for Consular Notification only serves to limit the protections and widen the possibilities for unlawful detainment and abuse of Americans overseas. In turn Americans elect their officials in Good Faith to protect their interests and inpart, insure their Safe Passage around the World. To assume that every country's laws are fair and just, that there will never be an instance of racial or national prejudice confronting Americans overseas would be an error leading to horrific harms committed against Americans, as payment in kind for failing to respect their citizens here. This laxity in American commitment could well become a horror for citizens of this land that travel abroad. Article 36 of the Vienna Convention is as important an agreement to the United States and its citizens as it is to all foreigners facing criminal charges here in the United States. To allow time again, the withering of this Country's commitment to Article 36 in its courts only shows the myopic disregard in which America adheres to its treaty obligations at the all too possible expense of its citizens and the world in general.

In addition to this argument regarding Equal Protection of foreigners in U.S. custody and U.S. citizens in foreign custody, Petitioner brings forth allegations of Due Process violations, Substantive Due Process violations, Equal Protection violations, Ineffective Assistance violations, Denial of Counsel of Choice, and numerous Human Rights violations as a direct and/or indirect result of the Deliberate Indifference shown for Petitioner's rights under Article 36 of the Vienna Convention.

When Petitioner was first taken to Havana County Jail, he

-9-

was denied all but one fifteen minute phone call every Sunday night. This restrictive procedure was extremely effective in disabling Petitioner's ability to contact some counsel other than the one he did. As a result Petitioner had to rely on assistance that fell short of the optimum competency that the 5th Amendment guarantees.

While at Havana County Jail Petitioner was held in a cage that disallowed any privacy, both for reasons of decency and legal privacy. Petitioner had his circadian rhythm attacked when he was placed in a windowless environment for all of his pretrial detention. Petitioner was exposed to artificial lights 24 hours a day, causing severe sleep depravation. Petitioner was then taken to see a (in house, visiting) "Doctor". As a result of the severe pretrial conditions, Petitioner was asked by this man if he felt any stress. To make a very long story short; Petitioner was prescribed Zanax® 3 times a day and 500mg. of Chloral hydrate every night. This drugging was systematic throughout Havana County Jail. As a result Petitioner was turned into a zombie to "cure", by the government, the very symptoms it created. Petitioner was drugged during his whole pretrial period, was drugged during his Plea, and weaned off slowly only after his guilty plea was accept- ed by the Court.

While Petitioner sat, confined and unaware of his Vienna Convention rights, the government housed Petitioner with a C.I. that elicited many questions about Petitioner's case. As a result the government unlawfully armed themselves with additional state- ments against Petitioner that were inaccurate, deliberately false, and procured for Malicious Intent.

While Petitioner sat, detained and uninformed of his rights on Consular Notification, Havana County Jail officials gave Petitioner such skimpy and inadequate meals that Petitioner lost over 30 pounds while on pretrial detention. This was done not only to save on the cost of detainment, but also to keep Petitioner's attention focused on his hunger; rather than the facts needed to successfully fight his case.

While Petitioner was confined in Havana County Jail, the county jail officials one day decided that it was okay for the detainees to have telephones in their cages. Unfortunately, the phones only worked by means of collect fees. Petitioner was forced to spend in excess of $30,000.oo  on phone calls to his attorney, on phone calls to his frantic Mom and on phone calls in a futile attempt to locate and hire a competent attorney. This charges exhausted Petitioner's resources needlessly at a time when, under American Law, he was supposed to be presumed innocent.

When Petitioner attempted to hire an attorney to act as co-counsel, this attorney made fraudulent claims to Petitioner, and never acted in any other way, or present any other defense strategy than Petitioner's originally hired defense counsel. This was during a time when Petitioner had a right to be apprised, but wasn't, of his Vienna Convention rights on Consular Notification.

Because Petitioner was never apprised of his consular Notification rights, he was placed in a situation where there was no independent investigation into the charges placed against him. Petitioner feels that there were enough mitigating circumstances, and enough contradictory statements made by the government's witnesses to warrant more than an optimistic expectation that the outcome of events would have led to a different Sentence.

-11-

While Petitioner was in detained in Havana County Jail, he was housed in the same cage with Louis Isirov, who by then had turned into a major government informant, who for many weeks badgered, coerced, threatened and pleaded with Petitioner for both of them to align their versions of past events so as to be able to bring an air of suspicion and subsequent criminal charges against innocent individuals. Petitioner is ready to provide this Court with at least twenty names of people who Isirov wanted to bring false statements against to the Grand Jury. Petitioner to this day does not know if any of these individuals have been incarcerated as a result of Louis Isirov's false statements. Because at the time of these events Louis Isirov was already helping out in "Sting Operations" with Law Enforcement agents, Petitioner believes that Louis Isirov was acting under the authority of the United States Prosecutor's Office when he asked Petitioner to be a false witness against Innocents. The fact that Petitioner's cage was equipped with a two way intercom, gives Petitioner the impression that Law Enforcement Officials assigned to this case were looking for Judas Goats to obtain convictions for them; instead of trying to do a complete and honest investigation for the truth.

When the government, through its representatives in Havana County jail, housed petitioner with government informants that continued to collect and fabricate information after Petitioner's indictment and initial detainment, Petitioner was exposed to what amounts to "custodial interrogation" without a Miranda warning from these government informants who were actually acting as representatives of the government. Artifice, deception, trickery, and fraud was used to break down Petitioner's ability to build a viable and intelligent defense.

Petitioner's main argument rests on the fact that it was an act of deception on the government's part to withhold from Petitioner his consular notification rights. The result of this deception led to numerous due process violations, substantive due process violations and Fifth Amendment, Sixth Amendment, Eighth Amendment, and Fourteenth Amendment violations; not to mention violations of International Law. Petitioner had an undisputed right to consult and request assistance from his consular post. The right extends itself to having the Greek Embassy complain or protest to Different Authorities other than the District Court of Judge Mills, where the numerous equal protection and human rights abuses were occurring.

Petitioner believes he had a right to ask assistance from embassy officials who would have had an undivided loyalty to Petitioner's cause. It was not enough that Petitioner had a retained attorney, since the function of a defense attorney, by official definition, is that of an "Officer of the Court, whose first loyalty is to the Court"; the precludes any defense attorney from committing complete loyalty to any one defendant.

A Treaty has been described as "something more than a contract". If this is the case, then Petitioner suffered something more, than just being a Third Party Beneficiary that was injured by a contractual default. The United States of America had/has an International Agreement with Greece to respect consular notification rights of foreign detainees. When a right as this is ignored it isn't to the harm of just a government, but to the adverse effect of the detained individual. It is with this perspective in mind that Petitioner believes, as does the International Court of Justice, that Petitioner had an individual right to have his consular post intercede on his

-13-

behalf. Hence, the violation of these rights puts to question the very credibility of the government.

Once the issue of credibility has been raised, the preponderance of the Evidence Standard justifies a complete investigation into the question of government credibility of their allegations, since prejudice must be presumed.

Had Petitioner's defense attorney, Mr. Axelrood, either objected to the government's violation of his client's Article 36 Rights, or taken it upon himself to provide notice of these rights to Petitioner personally, Petitioner would have availed himself immediately of these rights. Petitioner contends that Mr. Axelrood kept silent in the face of a blatant violation of his client's International, and U.S. guaranteed rights where, to do otherwise, would have brought a diplomatic presence into the case. A scenario not warmly welcome by most attorneys; where the diplomatic presence of overseeing the defense of their countryman would have created external pressure on Mr. Axelrood, whereby he would have known that his performance as an attorney was being judged and overseen by foreign consulate officials, whose duties are to reasonably ensure that their detained countryman receives a chance at a fair trial and is not treated different because of the origin of his birth.

In exercising their International duties, these consulate officials would have expected the Defense to provide, and employ mumerous resources in their countryman's defense. Therefore, Mr. Axelrood likely was aware of the fact that had he ojected to the fact that the government had blatantly violated Petitioner's Article 36 Rights, or provided Petitioner with verbal notice of his Consular Notification Rights himself, that substantial consequences potentially

-14-

affecting numerous other cases of this nature would have altered
this area of American Law and proceedure in the Central District
of Illinois; possibly resulting in innumerable civil and criminal
actions and appeals by other litigants for years to come.

Because Petitioner's attorney, after all, had a First Oblig-
ation and Loyalty to the Court, anything litigated that would have
presented the government in anything else other than "the most
favorable light to the prosecution", would have put Mr. Axelrood
in a position of disloyalty and compromise.

The reasonable probability that the Greek Consulate's over-
sight of this case, and the likely expectations voiced by the con-
sulate that the Government make accessible and the Defense investi-
gate fully all the facts, mitigating circumstances, locate, inter-
view, and subpoena all potential witnesses, including all defendants
that were claiming that David Karr and Louis Isirov were fabricating
drug amounts and stories against them.

There is reasonable probability the consulate would have ques-
tioned Mr. Axelrood's failure to protest at Petitioner's Bail Hearing.
Consulate would have been a constant irritant to both the government
and defense lawyer. Their actions and motives would not only been
questioned but the Greek Consulate would have had the power and auth-
ority and willingness to file formal protests with the State Depart-
ment, the moment that the Greek Consulate believed that Petitioner's
Constitutional, and human Rights were being violated, of which could
result in an ineffective defense, and thus and unjust incarceration.

Petitioner's attorney, Mr. Axelrood, and the government knew
that a diplomatic presence in the case would have resulted in the
need for additional outlay of time and energy in order to gather all

the facts, locate potential witnesses, arrange for their presence at trial, employ investigative experts in order to uncover the complexity of the fraud the government was committing upon the Court, and to organize all these facts, reports, findings, and testimony in a cognizable fashion for presentation at trial. These extra measures would have greatly taxed both the government's and also Defense Counsel's energies and would have caused Mr. Axelrood to compromise his Loyal Standing in the eyes of the very Court he has sworn first loyalty to.

That cold reality would have weighed heavily upon Defense Counsel's mind. The diplomatic presence would have forced both Mr. Axelrood and the government to act in a completely different fashion than they both did. If Defense Counsel was seen as ineffective by the Consulate Post's Officers this would have painted an unsightly picture as to the quality of defense that foreign nationals received in the American Judicial System. With a consular presence, the government ran the risk of being viewed as processing foreign national's cases with prejudice. This in turn would have put both the Court and the Defense Attorney in the direct path of International outcry and condemnation.

Petitioner contends that for these reasons, Mr. Axelrood, keeping in mind the potential consequences, chose to remain silent as to the violation of his client's Article 36 Rights, rather than risk being viewed by the Court as disloyal and by the Greek Embassy as ineffective.

When Petitioner was originally arrested he contacted Mr. Axelrood who directed Petitioner to cooperate with authorities. This advise was done without Defense Counsel ever doing an investigation.

This attitude Defense Counsel came into the case with, prejudiced Petitioner to the point that Petitioner couldn't meaningfully assist in his own defense. When Mr. Axelrood did not adequately investigate all avenues of defense, he might as well have signed on to the prosecutorial team. When Defense Counsel failed to professionally advocate on Petitioner's behalf at the Bail Hearing, failed to investigate all facts, and interview all potential witnesses as to the true amount of drugs in the conspiracy and Petitioner's exact relationship with Louis Isirov (the mastermind of said conspiracy), Petitioner was left in a position of handicap; in that Petitioner had to decide whether to plead guilty to events that did not occur and drug amounts that were never sold, or face the possibility of going to trial with an attorney he neither trusted nor had any confidence in his ability.

Had Petitioner's Vienna Convention Rights been honored by both the government and Defense Counsel (all Officers of the Court involved in Petitioner's detainment), Petitioner would never have been placed in such a position of compromise.

Petitioner had an Individual Right to contact his embassy for help upon arrest, detention, and imprisonment. The United States Government and Defense Counsel had an obligation to apprise Petitioner of any and all of his Rights including Article 36 of the Vienna Convention on Consular Notification. This violation caused a chain of adverse events to occur that led to ineffective assistance of counsel and highly questionable government conduct.

Had Petitioner's Consular Officials been informed of Petitioner's arrest and subsequent detention, under Article 36, the quality of Petitioner's defense would have put the government's case through the test of an adversarial process that was meaningful.

-17-

During Petitioner's sentencing Judge Mills looked down
at Petitioner and said, "You came to this Country and broke the
law; now go pay the Pied Piper." Petitioner avers that Judge Mills
has made statements of this nature to many foreigners before; there
have been articles written in the news papers concerning Judge
Mills's comments.

Petitioner further avers that if Judge Mills possessed any
LEANINGS TOWARD  PROTECTING INDIVIDUAL RIGHTS AGAINST UNDUE EN-
CROACHMENT BY THE GOVERNMENT he would have said at Petitioner's
sentencing something like this, " Son, I know you were born in an
other country before you came here, some 24 years ago, and I know
that this Country doesn't have a good record in the way they treat
foreigners such as yourself. With that in mind I have also noticed
that every time you have stepped into this courtroom there has
been no diplomatic presence at your side. Has anyone bothered to
tell you about your Vienna Convention rights concerning Consular
Notification? You do know that under International Law We have to
inform you that you have an absolute right to be assisted by your
Consulate in this time of trouble?" Absent such a statement Judge
Mills only cast his lot with the rest of the Court's officers in
their deliberate indifference.

Petitioner never had a chance at a fair trial with Judge
Mills as the presiding Judge, considering how the Constitution
guarantees that defendant be given an unbiased Judge to act as
a referee between the government and defense counsel.

Of course the government could respond that no matter what
leanings for the prosecution Judge Mills possessed/possesses, he did-
not sentence Petitioner to any extra time than what he had coming; in

-18-

he could have handed down an even stiffer sentence if he so chose. Unfortunately this argument puts the cart before the horse; Petitioner had the right to be sentenced to accurate amounts of drugs that were determined by a jury. Petitioner had a right to be treated the same as any other citizen during every step of the proceedings. And Petitioner had a right to face a Judge who did not factor Petitioner's foreign birth into any equation.

Petitioner would like to remind the Court, here in the Third Circuit that he comes from a State where a moratorium had to be placed on the death penalty because hundreds of people were railroaded into making false confessions. In the State of Illinois, where Petitioner resided and eventually brought to "Justice", half of all death row inmates were exonerated. The level of disregard of law enforcement personel for Constitutionally guaranteed rights is of public record.

Petitioner contends that all the facts herein are meant to paint an overall picture that would prove such a lopsided landscape of prejudice so as any rational minded observer would have no question that a fair trial was never offered to Petitioner. In fact quite the opposite happened; the level of disregard was so high that even a layman would have trouble calling the events just.

Petitioner's next contention rests on the fact that all quantities of drugs that Petitioner claimed not to have knowledge of, or outrightly disputed, were not a sentencing factor but elements of the offense. Thus even though, the government excepted a guilty plea, from Petitioner, to the overall conspiracy, it still had an obligation to submit disputed quantities to a jury. The failure to submit to the jury the quantity of drugs, the essential facts driving the sentencing calculation, denies due process of law and denies a right to

-19-

trial by jury.

Absent a jury verdict on drug quantity, the highest sentence would be computed using 21 U.S.C. 841(b)(1)(D), in which case the maximum sentence could be as low as one year.

Because, now, there is established case law to give credence to the theory of allowing a jury to decide elements of the offense, Petitioner would like to bring the argument that it is equally important to be able to bring in front of the jury, not just elements of enhancement but, mitigating issues that the sentencing court and Petitioner's attorney just ignored. For instance, no one conspirator in this instant case ever asked Louis Isirov (the mastermind of this whole debacle) for the exaggerated quantities of drugs he would force them to accept from him. This whole conspiracy revolved around one vain-glorious-extrovert who would impose his will on others, and force them through acts of coercion and death threats to do what he asked. Louis Isirov had/has extensive gangland ties and police ties which he would use ruthlessly when needed. It isn't hard to imagine the predicaments that arose every time someone weaker-willed crossed Louis Isirov's path. One of Louis's favorite acts was to show up at someone's house with drugs that were never anticipated nor requested. Once inside the house, there was no going back or getting rid of him; it was only a matter of time before Louis would break down a person's will and have them reluctantly agree to accept the responsibility for distributing them. In the next days to weeks to come the poor victim's life would gradually become a living nightmare; Louis would start to call every hour on the hour demanding that his drugs be sold faster because he had to pay-off whom-ever he owed. This bizarre scenario would continue to play itself out until Louis Isirov had completely destroyed the person's life. Louis Isirov was/is a predator

-20-

who stalked, stole, threatened, and terrified everyone he came in contact with. To verify what Petitioner claims all that needs to be done is to go back to the records of Louis's phone calls for the years 1988, 1989, and 1990. These records will show that while Louis had very few incoming calls, his outgoing ones were to the same numbers over and over again, many times, too many times, in one day. When Louis was finally arrested the police had many hours of taped phone conversations in which Louis had made explicit death threats. Death threats were a way of Louis Isirov's life. While David Karr was tape-recording Louis Isirov's statements for the D.E.A., they both left something of their individual personalities, for anyone who cares enough to examine. In over one hundred pages of transcribed phone conversations between David Karr and Louis Isirov, both entered a contest to see which one could lie to the other more effectively. This is a testament to their personalities. Petitioner was never aware of the extent and obviousness of Profiling Material these pages offered until after Petitioner was sent to prison and he requested his "paper-work" from his lawyer.

Since this very case rested on the credibility of Louis Isirov and David Karr, Petitioner believes he had an absolute right to be able to bring the matter of drug quantity to a jury and insist on a standard of reasonable doubt. Petitioner also believes he had a right to bring to a jury arguments of mitigation, because not only did Peti-tioner not agree with the terror that Louis was bringing into his and everyone else's lives, but also did not want anything to do with him. On the night of Petitioner's arrest, Petitioner was never told by Louis Isirov what his intentions were. After a long protracted argument, Louis promised Petitioner that they were only going to a

party and there were no drugs in the car. Petitioner was impeached because he would not admit to events that were deliberately colored to fit a light that was more favorable to the prosecution and meant to make a conviction easier. A true search for the truth was never a consideration. Petitioner believes that he had due process considerations that were violated when the government and Petitioner's lawyer did not insist on bringing all statements of contradiction to a jury.

Because Petitioner's main complaint rests on the shoulders of a treaty, it would be wise to ask some basic questions. Does the State Department help American Citizens when they are arrested overseas? Does the U.S. Government ever come to the aid of American detainees by using the Vienna Convention argument? Does a country's commitment to its treaty obligations signify a pattern of concern or indifference as each individual case is examined? Do foreigners have any rights to consular notification in the United States? Do American Citizens have any rights to consular notification in the foreign countries that are signators to Article 36 of the vienna Convention? The very way the courts have treated the question of treaty obligations in this country, raises the question: What exactly is a U.S. treaty worth?

The United States is a signator nation to the Convention Against Torture; this international agreement covers cruel, inhuman, or degrading treatment or punishments. Petitioner argues that to violate his Vienna Convention rights on Consular Notification led to a violation of the primary Convention. The exposure

suffered at Havana County jail, could be argued with sincerity, resulted in a grave miscarriage of justice. Petitioner has had to endure the loss of his freedom for over twelve years. It would be an ongoing absurdity to allow a conviction to stand under the specific circumstances involved in this instant case.

Petitioner was held accountable for 13.4 kilograms of cocaine. Paragraph 17 of Petitioner's presentence report claims that Louis Isirov sold/fronted Bruce adelman 17 ounces of cocaine. Without a competent attorney investigating these allegations, Petitioner had no other choice but to plead guilty to the quantities in Paragraph 17. The same holds true for Paragraph 19 which claims that Dupont received 8 ounces of cocaine from Bruce Adelman and gave them to David Karr. A rational attorney would have asked where this information came from; do all three of these defendants agree that the quantities described above are accurate? Do any of these three have a history of lying to law enforcement personal? Did the government promise anyone anything in explicit contrast to Supreme Court rulings? Again Paragraph 20 claims a two ounce sale; Paragraph 21, 4 ounces. Paragraph 22 claims that Louis Isirov sold Bruce Adleman 64 ounces. How was Petitioner allowed to plead intelligently to any of the quantities of drug sales that he was not a participant, without a thorough independent investigation? The only thing that Petitioner ever admitted to was a four ounce sale. Every other alleged quantity was either outright disputed or cloaked in mitigating circumstances. Petitioner strongly disputes the Court's authority to accept a guilty plea from someone who had no true knowledge of the accuracy of the government's contentions as to drug quantities.

Paragraph 23 of Petitioner's presentence report claims
that David Karr obtained six kilos of cocaine from Louis Isirov,
between November 1989 and February of 1990. The claim goes on
that these transactions were conducted at Petitioner's residence.
Petitioner immediately, after reading his PSI, informed his attor-
ney that these quantities were fabricated. Petitioner's attorney
responded with a statement claiming it "really does not matter in
the long run". Had Petitioner's attorney been interested in conduc-
ting a pre-trial investigation he would have uncovered the fact
that Louis Isirov was also disclaiming these quantities. Petitioner
to this day still wonders how he could be threatened with testimony
from government witnesses who never stopped calling each other,
"liar". Because of the extraordinary events of this specific case,
Petitioner makes a substantial claim as to be given absolutely no
opportunity to obtain a fair trial.

To begin to understand Petitioner's argument under the pro-
per light, it must be first understood that the Government of the
United States failed to comply with Articles 36 and 35, respectively,
in not advising Petitioner upon his detention of his right to con-
sular assistance. These provisions, once ratified by the Senate,
constitute self-executing municipal law of the United States, which
is individually enforceable in the courts of this country upon pro-
per request by an affected detainee. This position not only serves
to protect foreign nationals' rights in U.S. courts but also takes
a stance that serves to protect U.S. citizens' rights while travel-
ling abroad. Secondly, Petitioner contends that because Articles
35 and 36 were violated he suffered extreme Constitutionally defined
harms; some of which touch on Due process, ineffective assistance,

Equal Protection and Cruel and Unusual punishment. Finally, Petitioner makes the assertion that since U.S. courts have claimed in he past that a Vienna Convention violation claim that can establish prejudice has the merit of serious inquiry. Petitioner believes he has established that and therefore, has an undisputed right to have his conviction put to the question and the inalienable right to proceed through a habeas corpus to request the Court to correct a grave injustice.

Petitioner has a very strong reason to question the Criminal Justice System he was exposed to. In other "enlightened societies" defendants are required to go to trial as a matter of course. It is not a common practice to encourage guilty-pleas, quite the contrary to the American norm, a person is not punished for exercising his/her Constitutional rights; this allows the government to have to prove their allegations completely and the defendant to be able to bring all mitigating circumstances to the fore.

Petitioner was arrested through a scenario of deceptive construct devised by the government; when Petitioner denied any knowledge of the actual objective of his codefendant's aims on the night of arrest, he was impeached and threatened. This was done even though Petitioner's codefendant, Louis Isirov, had a history of compulsive lying. When Petitioner relied on his attorney for competent advise, he was told to do everything the government wanted. This was done at a time when everyone involved with the Court had an Internationally established obligation to abide by the agreements sanctioned under Articles 35 and 36 of the Vienna Convention.

When Petitioner explained to his jailers that his living conditions were inhumane and made it impossible, under those conditions to build a defense against the government's case, Petitioner

was systematically drugged with addicting mind-numbing "mood elevators" and sleeping pills. When Petitioner expected the government to treat him the same as any other citizen he was arbitrarily stripped of his American Citizenship and detained not as a Naturalized Citizen but as an "Alien Risk of Flight". [This stripping was allowed to happen through blatant ineffective assistance and prosecutorial misconduct; since Petitioner's mother became a citizen when Petitioner was legally a minor, the U.S. Attorney had a legal obligation to bring this fact to the Court's attention.]

When Petitioner needed to be competently advised as to avenues open to him for fact finding and possible discovery of incidences where the government witnesses in his case had prior histories of providing untruthful statements, his requests and legal inquiries fell on deaf ears.

When Petitioner expected Equal Protection he was sentenced to many years more than the most culpable of his codefendants; later he was taken to serve his sentence to an institution whose security level was much higher than the most threatening, menacing and most culpable of his codefendants. For the record, Petitioner never threatened to "light" someone's "family up like the city", for the record, Petitioner never forced anyone to take drugs from him, Petitioner never attempted to thwart justice by planning to blow up an automobile; endangering the publics' safety in the exchange. Petitioner neither coerced, threatened, cajoled or terrorized anyone to sell drugs for him, yet Petitioner received a sentence that was many years longer than the most culpable of his codefendants.

Petitioner begs the Court to keep in mind that he is not

attempting to enter this writ of habeas corpus § 2241 into the record with a request for leniency. Petitioner will soon be released and removed from the United States after serving in excess of twelve (12) years. These are twelve years that Petitioner believes were forced upon him in violation of numerous Constitutional and Internationally established guarantees.

Petitioner will be able to now respond to the government's response with the help of competent legal aid, will now be able to research on a computer, and access to a body of information on International Law that was deprived to him in the various prison libraries he had to make do with.

If there are any questions of "fairness", then Petitioner humbly asks the Court to allow him the threaten witnesses just like the government has done in his case. Petitioner asks the Court to allow him to bribe witnesses, just like the government has done in this instant case. Petitioner asks the Court to have the Respondents in this case be systematically drugged and entombed just like the government had done to Petitioner. In the name of "Fairness and Justice", Petitioner asks that the Court treat the government the same he was treated before he was "allowed to plead guilty". If the Court is concerned with fairness as a means to Justice then Petitioner begs this Court to allow him to present his case with the preponderance of the evidence viewed in the light most favorable to Petitioner; instead of the other way around.

Petitioner has one final question he would like to ask this Court. After having read the Constitution of the and for the United States of America; Petitioner found himself confused. It is his understanding that the United States Constitution is the Supreme Article of Law, and in it the government has only three (3)

jurisdictional powers; that under Common Law, Equity Law, and Admiralty/Maritime. Petitioner does not understand where exactly his charge falls under.

Petitioner believes that many of his Constitutional guarantees were violated. He further believes that the Constitution of the and for the United States of America is a legally binding contract that puts the responsibility of enforcement and submision on the shoulders of the officials that have sworn to uphold it. Petitioner has voluntarily signed no other agreements, other than the Selective Draft; on the other hand every officer of the Court and every elected official has sworn to obey and protect this legally binding document.

With this said, Petitioner would like to turn to the Argument part of this Writ of Habeas Corpus § 2241.

## 12. Argument

### A. Petitioner's right to maintain § 2241 vehicle even though he is to be released soon.

Petitioner avers that even though he is to be released soon, he still has a right to submit and maintain his habeas corpus rights. "The 'in-custody' federal jurisdictional requirement is determined as of date habeas corpus petition is filed in district court." **U.S. ex rel. Wojtycha v. Hopkins**, C.A.3 (N.J.) 1975, 517 F.2d 420. Also, "It is possible to continue after release a petition for habeas corpus filed before release." **Bramlett v. Peterson**, D.C.Fla. 1969, 307 F.Supp. 1311; "Alien was 'in custody' for habeas corpus purposes, notwithstanding her removal from the United States,

because custody was measured at time petition was filed." <u>Chong v. District Director</u>, I.N.S., C.A.3 (N.J.) 2001, 264 F.3d 378.

## B. Why Petitioner is entitled to relief under 28 U.S.C. § 2241

Federal courts continue to retain jurisdiction to entertain habeas corpus petitions from federal prisoners "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241 (c)(3).

Section 2241 states that "writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district court and any circuit judge within their respective jurisdictions" to prisoners "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241 (a),(c)(3).

The Supreme Court has held that a federal court may grant the writ so long as the prisoner's custodian is within the court's jurisdiction[2]. <u>Braden v. 30th Judicial Circuit Court</u>, 410 U.S. 484, 499-500, 93 S.Ct. 1123, 1131-32 335 L.Ed.2d 443 (1973). See also, <u>Poodry v. Tonawanda Band of Seneca Indians</u>, 85 F.3d 874, 890 n.17 (2nd Cir.), cert. denied, 117 S.Ct. 610 (1996).

The Sixth Circuit Court of Appeals stated in <u>In re Hanserd</u>, 123 F.3d 922, 930 (6th Cir.1997) that a §2241 motion is not barred by new restrictions on successive motions and petitions imposed by the AEDPA. See also <u>Forde vs. United States Parole Commission</u>, 114 F.3d 878 (9th Cir.1997)(An attack on the execution of sentence is not subject to the deadlines set by the AEDPA).

In <u>Grey-Bey vs. United States</u>, 209 F.3d 986 (7th Cir. 2000) the District Court for the District of Arkansas transferred a writ of habeas corpus under 28 U.S.C. §2241 to the Seventh Circuit after concluding that the petitioner ["Grey-Bey"] was attempting to evade the limitations on second or successive collateral

---

[2]The custodian for this purpose is the prison warden or director. <u>Yi vs. Maugans</u>, 24 F.3d 500, 507 (3rd Cir. 1994).

attacks under 2255.

The Seventh Circuit stated that "...a district court presented with a petition for a writ of habeas corpus under 2241 should analyze that petition on its own terms, without assuming that whatever cannot proceed under 2255 also cannot proceed under 2241..." Id. at 990. See also **Valona vs. United States**, 138 F.3d 693 (7th Cir. 1998)(Not all multiple collateral attacks are "second or successive" for purposes of statutory restrictions on petitioner's ability to file second or successive motion to vacate), **Barapind vs. Reno**, 2000 WL 1210050 (9th Cir. 2000)(However, the gatekeeping provision of AEDPA, as set forth in 28 U.S.C. 2244, do not apply to all habeas petitions, nor are all multiple attacks "second or successive").

The Seventh Circuit concluded that "Grey-Bey began these proceedings by filing a 2241 petition in the Eastern District of Arkansas, and we think that he is entitled to a decision in the regular course—that is, by a district judge, followed by appellate review and the opportunity to seek review by the Supreme Court—under that statue." **Grey-Bey** at 990. The Seventh Circuit went on to transfer the papers to the district court for consideration as a petition for a writ of habeas corpus under 2241.

Similarly, in **Hernandez vs. Campbell**, 204 F3d 861 (9th Cir. 2000), the Ninth Circuit held that the district court may not transfer a 2241 habeas corpus petition without first making a determination whether the savings clause applies. [A district court is obligated to determine whether a petition falls under 2241 pursuant to the savings clause].

The Court wrote:

> "The Central District was also incorrect in stating that 2241 petitions may not address the legality of sentences. Indeed, the whole point of the savings clause is to allow petitions to be filed under 2241 when 2255 is "inadequate or ineffective." Id. at 866, footnote 7.

attacks under 2255.

The Seventh Circuit stated that "...a district court presented with a petition for a writ of habeas corpus under 2241 should analyze that petition on its own terms, without assuming that whatever cannot proceed under 2255 also cannot proceed under 2241..." Id. at 990. See also **Valona vs. United States**, 138 F.3d 693 (7th Cir. 1998)(Not all multiple collateral attacks are "second or successive" for purposes of statutory restrictions on petitioner's ability to file second or successive motion to vacate), **Barapind vs. Reno**, 2000 WL 1210050 (9th Cir. 2000)(However, the gatekeeping provision of AEDPA, as set forth in 28 U.S.C. 2244, do not apply to all habeas petitions, nor are all multiple attacks "second or successive").

The Seventh Circuit concluded that "Grey-Bey began these proceedings by filing a 2241 petition in the Eastern District of Arkansas, and we think that he is entitled to a decision in the regular course—that is, by a district judge, followed by appellate review and the opportunity to seek review by the Supreme Court—under that statue." **Grey-Bey** at 990. The Seventh Circuit went on to transfer the papers to the district court for consideration as a petition for a writ of habeas corpus under 2241.

Similarly, in **Hernandez vs. Campbell**, 204 F3d 861 (9th Cir. 2000), the Ninth Circuit held that the district court may not transfer a 2241 habeas corpus petition without first making a determination whether the savings clause applies. [A district court is obligated to determine whether a petition falls under 2241 pursuant to the savings clause].

The Court wrote:

"The Central District was also incorrect in stating that 2241 petitions may not address the legality of sentences. Indeed, the whole point of the savings clause is to allow petitions to be filed under 2241 when 2255 is "inadequate or ineffective." Id. at 866, footnote 7.

D. PRIOR § 2255 MOTION WAS INADEQUATE OR INEFFECTIVE TO TEST THE
LEGALITY OF PETITIONER'S DETENTION.

Petitioner is entitled to relief under U.S.C. § 2241 because
(a) 2241 applies to Treaty violations and 2255 does not, (b) the
remedy afforded by § 2255 is not the functional equivalent of the
one provided in § 2241 because an adverse decision in a § 2255 is
not reviewable unless certain criteria are met, whereas an adverse
decision in a § 2241 is reviewable without restriction.

Today, federal courts continue to retain jurisdiction to
entertain habeas corpus petitions from federal prisoners "in custo-
dy in violation of the Constitution of the laws or treaties of the
United States." 28 U.S.C. § 2241(c)(3). Section 2241 states that
"writs of habeas corpus may be granted by the Supreme Court, any
justice thereof, the district court and any circuit judge within
their respective jurisdictions" to prisoners "in custody in viola-
tion of the Constitution or laws or treaties of the United States."
28 U.S.C. § 2241 (a),(c)(3); see **In re Dorsainvil**, 119 F3d 248 (3rd
Cir. 1997); **Triestman v. United States**, supra at 337.

**In re Hanserd**, 123 F.3d 922, 929 (6th Cir. 1997) states: if 'the
remedy by [Section 2255] motion is inadequate or ineffective to test
the legality of his detention,' then a federal prisoner may apply
for a writ of habeas corpus under 28 U.S.C. § 2241, § 2244. 28 U.S.C.
§ 2255. See also, **Triestman v. United States**, 124 F.3d 361 (2nd Cir.
1997), **In re Dorsainvil**, supra at 245, **Koster v. INS,** 101 F.3d 785
(1st Cir. 1996).

Mr. Koukoulomates was denied a full and fair hearing on his
original § 2255 motion. The court denied Mr. Koukoulomates 2255 first
because the district judge felt that Petitioner did not possess a

right to file a § 2255 because Petitioner's attorney had never filed an appeal. The second reason Petitioner was denied a full and fair hearing on his original § 2255, because even though the United States government had a responsibility to inform Mr. Koukoulomates of his Vienna Convention Rights To Consular Notification, it would be at least five (5) years after submitting his § 2255 that Petitioner learned, and not from the U.S. authorities, about his **VCCR Rights**, thus making it impossible for him to raise the issue of a treaty violation at that time. A federal prisoner denied a full and fair hearing on the § 2255 motion has an "inadequate or ineffective" remedy under § 2255 and thus is entitled to proceed in federal habeas corpus. **Sanders v. United States**, 373 U.S. 1, 14 - 15, 83 S.Ct. 1068, 1076-77, 10 L.Ed.2d 148 (1963). A federal prisoner who cannot get total and complete relief in a § 2255 motion is entitled to proceed with a § 2241 habeas petition. **Cohen v. United States**, 593 F.2d 766, 771 & n.12 (6th Cir. 1979)(allowing federal inmate to use habeas corpus where § 2255 remedy inadequate). Moreover, the Court in **In re Hanserd** stated that a § 2241 motion is not barred by the new restrictions on successive motions and petitions imposed by the AEDPA. **Id** at 930. See also **Forde vs. United States Parole Commission**, 114 F.3d 878 ( 9th Cir. 1997)(An attack on the execution of sentence is not subject to the deadlines set by the AEDPA).

E. PETITIONER HAD AN ABSOLUTE INTERNATIONAL AND DOMESTIC RIGHT TO
BE NOTIFIED OF HIS VIENNA CONVENTION (VCCR) RIGHTS WHICH REQUIRE
MANDATORY NOTIFICATION OF ALL FOREIGN DETAINEES.
F. ALL OFFICERS OF THE COURT SHARED THE COLLECTIVE RESPONSIBILITY
TO ADHEAR, AND ADMINISTER THIS UNITED STATES OBLIGATION.


The Petitioner had an International right to be notified by
the Local, State, Federal Agencies, Law Enforcement Employees and
any other Officials, Officers of the Court, including his Defense
Attorney of his right to consular access and communication under
the **Vienna Convention on Consular Relations (VCCR)**. **Federal Republic
of Germany v. United States (LaGrand), 2001 ICJ 104 (2001).** The
**International Court of Justice** ruled that a noncitizen arrestee's
rights under Article 36 are individual rights that cannot be pro-
cedurally defaulted in U.S. or state courts. The **ICJ** also held that
prejudice need not be shown to show a violation of **Article 36.**

The Petitioner was never notified of his right to mandatory
consular notification and access. Petitioner heard about the Vienna
Convention for the first time after ten-and-one-half years had been
served of his incarceration. This was a flagrant violation under
**Article 36** of the **Vienna Convention On Consular Relations,** April 24,
1963, 21 U.S.T. 77, 596 U.N.T.S. 261, 1967 WL 18349 (ratified Nov.
24, 1969) (hearinafter "**Vienna Convention**"). When Petitioner was
arrested on November, 1990 all law enforcement personel had an obliga-
tion to notify Petitioner of his right to consular access. See **Con-
sular Convention,** 3 U.S.T. 3426, **Article 16, paragraph 2** (signed 1951;
entered into force 1952), which states the following:

> "A consular officer shall be informed immediately by the
> appropriate authorities of the territory when any national
> of the sending state is confined in prison awaiting trial or
> otherwise detained in custody within his district".

Also see **UNITED STATES DEPARTMENT OF STATE, CONSULAR NOTIFICATION AND ACCESS, Instructions for Federal, State, and local Law Enforcement and other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Access,** publication 10518, office of the Legal Adviser, released 1998, **page 1, 3, 4, 5, 7, 14, Id,** which contains the following statements:

> "In all cases, the foreign national must be told of the right of consular notification and access.  Page 13.

> "Whenever a foreign national is taken into custody, the detaining official should determine whether consular notification is at the option of the foreign national or whether it is mandatory".  Page 13.

> **"SUMMARY OF REQUIREMENTS PERTAINING TO FOREIGN NATIONALS:**
>
> 1. When foreign nationals are arrested or detained, they must be advised of the right to have their consular officials notified.
>
> 2. In some cases, the nearest consular officials must be notified of the arrest or detention of a foreign national, regardless of the national's wishes.
>
> 3. Consular officials are entitled to access to their nationals in detention, and are entitled to provide consular assistance.

> These are mutual obligations that also pertain to American Citizens abroad. In general, you should treat a foreign national as you would want an American Citizen to be treated in a similar situation in a foreign country. This means prompt, courteous notification to the foreign national of the possibility of consular assistance, and prompt, courteous notification to the foreign national's nearest consular officials..."  Page 3.

The Petitioner avers that in his view the Government of the United States of America and all officers of The Court failed to comply with **Articles 36·of the Vienna Convention and Consular Convention, 3 U.S.T. 3426, Article 16, paragraph 2, respectively, in not advising the** Petitioner upon his arrest and detention of his **right** to **consular assistance.**

Moreover, **Article 36(1)(b)** of the **Vienna Convention** states that the authorities of the "receiving state", shall, without delay, inform any detained foreign national of his right to have the consular post of the "sending state"(in this instant case **Greece**) notified of his detention. **Article 36(1)(c)** of the **Vienna**

**Convention** gives consular officers the **Right** to visit and correspond with detained foreign national and to arrange for **his legal representation**. See **Id. Article** 36(1)(c).

In this instant case, there was **never** a notification by anyone from the United States Government, including Petitioner's own defense counsel, Larry Axelrood, who was also an "officer of the Court". See **U.S. v. Frank**, 53 **F.2d 128, 129**. Also see **Pearse v. U.S., 59 F.2d 518.**

The Petitioner was **not aware** of such right until early in 2002, ten and one half years after Petitioner was originally arrested. Petitioner was therefore unable to exercise this **right** on his own. Had Petitioner been informed of his **VCCR Rights** he certainly and definitely would have exercised his right by contacting his consular officer for assistance, such as help to get a competent attorney who did not have a conflict of interest, and who would have forced the government to prove every element of their case. Petitioner would have requested his consular officials to make an immediate request to house Petitioner in an environment that allowed him the dignity that befits a member of the human race. Petitioner would have requested that his consulate officers visit him while he was in custody. Every area of recourse was effectively cordoned off by the deliberate indifference of the U.S. officials to Petitioner's undisputed rights.

The **United States Constitution** provides that **ratified treaties** are to be regarded as the **supreme law of the land**. See **U.S. CONSTITUTION. ARTICLE VI, CLAUSE 2. SUPREME LAW OF LAND** states that:

> "This constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the judges of every state shall be bound thereby, anything in the Constitution or the Laws of any State to the contrary notwithstanding".

Under federal law treaties have the same legal effect as statues. See, e.g., **Whitney v. Robertson**, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888). The Supreme Court has recognized that treaties can create individually enforceable rights. See, e.g., **United States v. Alvarez-Machain**, 504 U.S. 655, 667-68, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). It has long been recognized that, where treaty provisions establish individual rights, these rights must be enforced by the courts of the United States at the behest of the individual. See **United States v. Rauscher**, 119 U.S. 407, 418-19, 7 S.Ct. 234, 30 L.Ed. 425(1886) (citing Head Money Cases, 112 U.S. 580, 5 S.Ct. 247,28 L.Ed. 798 (1884); See also **United States v. Alvarez-Machain**, 504 U.S. 655, 659-60 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). In **United States v. Rangel-Gonzales**, 617 F.2d 529, 532 (9th Cir. 1980), the Court stated that "[T]he right established by the regulation intended to ensure compliance with the Convention and in this case by treaty is a personal one." "Moreover, the language of the provision is not precatory, but rather mandatory and unequivocal... Accordingly, individual foreign nationals have rights under **Article 36(1)(b) of the Vienna Convention**."

In the dissenting opinion in **U.S. v. LOMBERA CAMORLINGA**, Cite as **206 f.3d 882  (9th Cir. 2000)**, on page 895 Judge WARDLAW states "A nation's commitment to the rule of law is measured by its willingness to subject its own government to it. The Vienna convention requires the United States law enforcement officers to inform arrested foreign nationals of their right to have their respective consulates notified of the arrest. It further requires that this right be exercised in accordance with the laws of the arresting country. These obligations were not conjured by the judiciary; they were negotiated

-37-

by the President and ratified by the United States Senate. Each
year, the Department of State notifies law enforcement officials
of their obligations under the Treaty." In **IN RE B-727 AIRCRAFT
SERIAL NO. 21010**, Cite as 272 F.3d 264 (5th Cir. 2001), the quote of
the day is "it has long been the law that the consular agents of
nations are accorded the right to appear in our courts to protect
their nationals...Their role is not limited to protecting the rights
of foreign sovereigns." Citing **The Maret**, 145 F.2d 431, 438 (3d Cir.
1944) (Citing **The Bello Corrunes**:The Spanish Consul., Claimant, 19
U.S. (6 Wheat) 152, 5 Led. 229 (1821)).

In **Ledezma v. State**, 626 N.W.2d 134 (Iowa 2001) the trial
counsel rendered ineffective assistance of counsel, inter alia,
when he failed to inform the defendant of his right to consular
access under Article 36 of the VCCR.

In **STANDT v. CITY OF NEW YORK**, Cite as 153 F.Supp. 2d 417
(S.D.N.Y. 2001) the Court not only gave STANDT a right to proceed
in a § 1983 claim. The Court when on to say "As with federal statues,
it is not unusual for 'substantive rights [to] be defined by [treaty]
but the remedies for their enforcement left undefined or relegated
wholly to the states.'" **Vazquez, 92 Colum.L.Rev. at 1144** (quoting
Hart & Wechsler, The Federal Courts and the Federal System 553 (1988).
STANDT would have never been allowed to proceed in his § 1983 quest
without some finding of prejudice.

In **U.S. v. SANTOS**, 235 F.3d 1105 (8th Cir. 2000) the Court held
hat prejudice must be shown to justify suppression or an overturning
of a case, because of a **VCCR** violation. In **WALDRON v. I.N.S.**, 17 F.3d
511 (2nd Cir. 1993) again we see the Court insist on a showing of
prejudice. In fact every case petitioner has read  the courts of

this land have repeatedly insisted on showing of some fundamental
flaw with the Government's case before a Vienna Convention violation
is even considered. Therefore, Petitioner will devote, toward the end
of this writ, much time in explaining just how he was harmed by the
denial of his Consular Notification rights.

## G. THE SELF-EXECUTION OF TREATIES IN THE UNITED STATES

In stating the "general rule" that treaties do not create
individually enforceable rights, the courts completely ignore
the well-established doctrine of self-execution. See, e.g., **United
States v. Green**, 671 F.2d 46, 50 (1st Cir. 1982). The interplay between
the general rule and the doctrine of self-execution has been con-
fused over the years, but that confusion stems from the failure
to take into account the origins of the doctrine of self-execution
as well as the reasoning that led to its creation. See generally
**Carlos Manuel Vazquez, The Four Doctrines of Self-Executing Treaties,
89 Am. J. Int'l 695, 699 (1995).**

The general rule has its roots in English law. See **J.G. Starke,
Introduction to International Law 81-82 (10th ed. 1998); J.G. Collier,
Is International Law Really Part of the Law of England?, 38 Int'l
& Comp. L.Q. 924, 925-926 (1989)** (citing the Parliament Belge, 4
P.D. 129 (1879); See also **Ware v. Hylton**, 3 U.S. (3 Dall.) at 256,
274-275, rev'd on other grounds, 3 U.S. (3 Dall.) 199, 1 L.Ed. 568
(1796). In the English system, treaties are entered into, and con-
cluded, by the Crown without any intervention by Parliament. Con-
sequently, treaties are ineffectual domestically without implemen-
ting legislation from Parliament.

Dissatisfaction with that system, and the anarchial consequence
that binding treaties were often practically unenforceable, led the

Founding Fathers of this Country to abandon the English system in favor
of the United States Constitution's system of treaty negotiation by the
Executive and ratification by the Senate. By its unambiguous text the
Supremacy Clause declares treaties to be "the Supreme Law of the Land",
and thus automatically incorporates these international agreements
into the domestic law of the United States, without the need for further
action once the treaty is ratified by the Senate. The effect is to
render treaty provisions enforceable in the courts at the behest of
affected individuals, in applicable cases. See **United States v. Alvarez-
Machain**, 504 U.S. 655, 667, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) (" The Extradition
Treaty has the force of law, and if...it is self-executing, it would
appear that a court must enforce it on behalf of an individual regard-
less of the offensiveness of the practice of one nation to the other");
**United States v. Puentes**, 50 F.3d 1567, 1575 (11th Cir. 1995) (same). **Contra Tel-
Oren v. Libyan Arab Republic**, 726 F.2d 774, 808 (D.C. Cir. 1984) (Bork, J., Concurring)
("Treaties in the United States do not generally create rights that
are privately enforceable in courts ").

    In one of the first cases to consider the applicability of the
British rule under the U.S.'s constitutional system, the Supreme
Court Stated that :

> In the United States a different principle is established. Our Constitution
> declares a treaty to be the law of the land. It is consequently, to be  re-
> garded in courts of justice as equivalent to an act of the legislature, when-
> ever it operates of itself without the aid of any legislative provision.

**Foster v. Neilson**, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829); cf. **United States
v. Percheman**, 32 U.S. (7Pet.) 51, 8 L.Ed. 604 (1833); See also **Edye v. Robertson
("Head Money Cases")**, 112 U.S. 580, 598-99, 5 S.Ct. 247, 28 L.Ed 798 (1884) ("A treaty,
then is the law of the land as an act of Congress is, whenever its pro-
visions prescribe a rule by which the rights of the private citizen or
subject may be determined.")

Unfortunately, it is not the same playing field today that existed when the Court decided **Foster** and **Percheman**, whose holding has since been distorted beyond recognition with the tail end of the quoted language often wagging the principal rule established by those cases. Cf. **Goldstar (Panama), S.A. v. United States**, 967 F.2d 965, 968 (4th Cir. 1992); **Frolova v. Union of Soviet Socialist Republics**, 761 F.2d 370, 373 (7th Cir. 1985); **Cardenas v. Smith**, 733 F.2d 909, 918 (D.C.Cir.1984); **Tel-Oren v. Libyan Arab Republic**, supra; **British Caledonian Airways v. Bond**, 665 F.2d 1153, 1160 (D.C.Cir.1981); **United States v. Postal**, 589 F.2d 862, 874 (5th Cir.1979). There are, of course, many treaties entered into by the United States regarding which even after Senate ratification, and thus "incorporation" as municipal law, the subject matter is such that individuals lack standing to base claims or defenses in a court of law. See **Committee of United States Citizens Living in Nicaragua v. Reagan**, 859 F.2d 929 (D.C.Cir.1988). But such is not the present case. The bottom line to these cases seems to be that we should look to the "intent" of the treaty to determine whether it is self-executing, or more in point, whether it creates rights that individuals can enforce in the courts. As the majority purports to recognize, however, we begin this enquiry with the terms of the treaty. See **Alvarez — Machain**, 504 U.S. at 666, 112 S.Ct. 2188 (courts look first to a treaty's terms to determine its contents); **Stuart**, 489 U.S. at 365-66, 109 S.Ct. 1183 ("the clear import of treaty language controls unless 'application of the words of the treaty according to their obvious maening effects a result inconsistent with the intent or expectations of its signatories' "). If the Court looks to this guideline as the start-

ing point to an inquest in the present Writ, Petitioner fails to
see why further analysis is required or appropriate.

## H. THE TEXT OF ARTICLES 36 AND 35 OF THE VIENNA CONVENTION

Contrary to the U.S courts' characterization, the language
of the Vienna Convention is anything but ambiguous. Section 36(1)(b)
unequivocally states that:

> The...authorities **shall** inform the person [detained]...with-
> out delay of **his rights** [to consular notification and assis-
> tance].

This language particularly that which has been bolded,
(1) mandates ("shall") action, (2) without delay, (3) by the de-
taining "authorities," which action is, (4) to "inform" the de-
tained "person", (5) "of his," (6) "rights" to seek assistance
from his consular representatives. This provision does not entail
arcane or obscure parlance, or require the application of complex
notions or of concepts that are difficult to understand or decipher.
It simply requires a detaining authority in the United States, as
soon as a foreign national is detained, to inform him or her of
their right to request consular assistance with regards to the
detention.

Petitioner fails to understand why the courts of this land
allow this flagrant violation of U.S. national law by the govern-
ment. The courts of the United States should be the proper arena
for an individual to seek validation of his/her rights against
Governmental trangression of its own laws and regulations. See
**Fort Stewart Schs. v. FLRA,** 495 U.S. 641, 645, 110 S.Ct. 2043, 109
L.Ed.2d 659 (1990) (citing **Vitarelli v. Seaton**, 359 U.S. 535, 547,
79 S.Ct. 968, # L.Ed.2d 1012 (1959), and **Service v. Dulles**, 354 U.S.

363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957)). "Indeed, given
that a treaty should generally be 'construed...liberally to give
effect to the purpose which animates it' and that '[e]ven where
a provision of a treaty fairly admits of two constructions, one
restricting, the other enlarging, rights which may be claimed
under it, the more liberal interpretation is to be preferred,' "
**Stuart**, 489 U.S. at 368, 109 S.Ct. 1183, Petitioner cannot under-
stand this Nation's courts' position on Vienna Convention vio-
lations. See **Immigration & Naturalization Service v. Cardoza-
Fonseca**, 480 U.S. 421, 452, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)
(Scalia, J. concurring)("[I]f the language of a statue is clear,
that language must be given effect...at least in the absence of
a patent absurdity.").

## I. THE BACKGROUND TO ARTICLE 36 OF THE VIENNA CONVENTION

Of all the provisions of the Vienna Convention, the one
with the "most tortured and checkered background is indubitably
Article 36." See Luke Lee, **Vienna Convention on Consular Rela-
tions 107 (1996).** This provision was the subject of extensive and
divisive debate before it was finally approved, with the differ-
ences centering mostly on the question of the foreign national's
autonomy and rights under the proposed Article 36. Id. at 107-14;
see also **1 United Nations Conference on Consular Relations: Official
Records, at 3, U.N. Doc. A/Conf. 25/6, U.N. Sales. No.63.X.2 (1963)**
(hereafter "**U.N. Official Records**").

The positions of the delegates from the United Kingdom and
Australia were typical of the prevailing view. The former expressed
his rejection of a proposal that a consul be notified only if the
detained national so requested, because "[i]t could well make the

provisions of Article 36 ineffective because the person arrested
might not be aware of **his rights**." Id. at 83-84 (emphasis supplied);
see also id. at 339, 344. The Australian delegate stated along a
similar vein, that "[t]here was no need to stress the extreme im-
portance of not disregarding, in the present or any other inter-
national document, the **rights of the individual**." Id. at 331 (em-
phasis supplied). In fact the United States delegate proposed an
amendment to Article 36(1)(b) that the notification to a consul
of a national's detention be made at the request of the national,
"to protect the **rights of the national concerned**." Id. at 337 (em-
phasis supplied). From these and other statements by various nat-
ional delegates there should be little doubt that the treaty under
consideration concerned not only consular rights but also the sep-
erate individual rights of detained nationals. Id. at 37 (state-
ment of Soviet delegate); **id.** at 37, 82, 85, 339, 345,(statements
of Tunisian delegate); **id.** at 38 (statement of the Congolese dele-
gate); **id.** at 339 (statement of Greek delegate); **id.** at 338 (state-
ment of the Korean delegate); **id.** at 332, 334 (statement of the
Spanish delegate); **id.** at 81, 339, 340 - 01 (statement of the Indian
delegate); **id.** at 82, 332 (statement of the French delegate); **id.**
at 84 (statement of the Federal Republic of Germany); **id.** (state-
ment of the delegate of Brazil); **id.** at 331 (statement of the dele-
gate of Venezuela); **id.** at 332 (statement of the delegate of Kuwait);
**id.** at 335 (statement of the Swiss delegate); **id.** at 336 (statement
of the delegate of New Zeland); **id.** at 343 (statement of Ecuador);
**see also** Mark Kadish, **Article 36 of the Vienna Convention on Con-
sular Relations: A Search For the Right to Consul,** 18 Mich. J. Int'l
L. 565 (1997) (discussing the Vienna Convention's history in this

respect); **Report of the United States Delegation to the United Nations Conference on Consular Relations, Vienna, Austria, March 4 to April 22, 1963** (hereinafter "U.S. Vienna Report").

During the course of the debate, the United Kingdom submitted the amendment to Article 36 that eventually became the final approved version of paragraph (b)(1), requiring the detaining nation to inform the detained foreign national of his/her right to consular access. The amendment was adopted 65 votes to 2, with 12 abstentions. The United States delegate voted in favor of the amendment. See **U.S Vienna Report** at **60.**

The letter of submittal of Secretary of State William P. Rodgers to the President dated April 18, 1969 is enlightening. In it Secretary Rodgers, in referring to Article 36(1)(b) indicates that:

> It requires that authorities of the receiving State inform the person detained of **his right** to have the fact of his detention reported to the consular post concerned and **his right** to communicate with that consular post. **If he so requests,** the consular post shall be notified without delay.

(Emphasis supplied).

The U.S. Vienna Report, which is attached to the Letter of Transmittal states the following:

> The solution adopted by the Conference to the problem of adjusting the notification obligations of the receiving State to the **right of the individual concerned** to request notification lies in the final sentence of subparagraph 1(b). That sentence **requires authorities of the receiving State to inform the person detained of his right** to have the fact of his detention reported to the consular post concerned and of **his right** to communicate with that consular post. This provision has the virtue of setting out a requirement which is **not beyond means of practical implementation in the United**

**States,** and, at the same, is useful to the consular service of the United States in protection of our citizens abroad. (Emphasis supplied).

The letter of Transmittal also includes the Report from the Committee on Foreign Relations reporting favorably on the Vienna Convention and recommending that the Senate give its advise and consent to the same. See **Sen. Exec. Rep. 91-9, 91st Cong. 1st Sess. (1969).** The Senate Report attaches the testimony of J. Edward Lyerly, the Deputy Legal Advisor for Administration before the Committee in which he states at the outset that "[t]he Convention is considered **entirely self-executive** and does not require any implementing or complementing legislation." (Emphasis supplied).

There is further evidence in actions taken by the State Department **ante litigio,** supportive of Petitioner's claim. Much can be found in the Department's booklet entitled "**Consular Notification and Access,**" a document instructing federal, state, and local law enforcement personal regarding foreign nationals in the United States and their rights to consular notification and access. This booklet indicates that the instructions therein are based on legal obligations set forth in the Vienna Convention and bilateral treaties which "**are binding on federal, state, and local government offficials to the extent that are within such officials' competence**", by virtue "**Article VI, clause 2 of the Constitution of the United States.**" Id. at 471. See Government's Supplemental Appendix on Rehearing En Banc, Vol.II. Under the rubric of "Summary of Requirements Pertaining to Foreign Nationals," the first directive states that: "1. **When foreign nationals are arrested or detained, they must be advised of the right to have their consular officials**

notified." Id. at 467. Later in this document there are "Suggested Statements to Arrested or Detained Foreign Nationals." Id. at 469. For example: "**In all cases, the foreign national must be told** of the **right** to consular access." Id.(emphasis in the original). This statement is repeated in like form on the next page. Id. at 472; see also id. at 477, 483, 484. The booklet also restates Mr. Layerly's averment before the Senate to the effect that "**[i]mplementing legislation is not necessary (and the Vienna Convention and Bilateral agreements are thus "self executing") because executive, law enforcement, and judicial authorities can implement these obligations through their existing powers**". Id. at 484 (emphasis supplied). Last but not least, the State Department thoughtfully provides a model "Consular Notification and Access Card" with the suggested statement to be made to the detained foreign national notifying **him of his rights**.

Millions of U.S. citizens travel abroad annually. In 1997 17,700,000 traveled to Mexico alone. The Time Almanac 2000, at 354. In that year 476,000 traveled to the People's Republic of China. Id. It is estimated that more than 3,000,000 U.S. citizens live abroad. The State Department vis-a-vis U.S. citizens arrested or detained in foreign lands, takes a position similar to Petitioner in this Writ. (Over 2500 U.S. citizens are arrested abroad annually. See U.S. State Department, Bureau of Consular Affairs, Office of Overseas Citizens Services). In its Foreign Affairs Manual, the State Department indicates that "**Article 36 of the Vienna Convention provides that the host government must notify the arrestee without delay of the arrestee's right to communicate with the American consul.**" Id. at 378 (emphasis added). Petitioner

-47-

believes that the Government's position regarding the retricted
application of the Article 36 (of the Vienna Convention) and
Article 35 (of the Bilateral Treaty) rights of foreign nationals
in the United States not only establishes a repugnant double stand-
ard but, considering more practical applications, sets up many
American citizens abroad for abuses that this Country will be hard-
put to object to, considering the tenor and outcome of the present
Writ. See **Gregory Dean Grisvold, Strangers in a Strange Land: As-
sessing the Fate of Foreign Nationals Arrested in the United States
by State and Local Authorities,** 78 Minn.L.Rev. 771, 792-94 (1994).

## J. The Interpretations of the Enforcement Authorities

Lastly we come upon the views of the enforcing authorities,
that is, the ones that on a day to day basis are in the business
of detaining and arresting persons, some of which are foreign nation-
als, and thus are charged with the practical implementation of
Article 36 and Article 35. In this respect, Petitioner's view is
that once the pertinent treaty is ratified and thus incorporated
into municipal law, the State Department should no longer be con-
sidered an "enforcing authority." The Principal federal governmental
entities fitting this description are the Department of Justice and
the Immigration and Naturalization Service, (see 28 C.F.R. § 50.5(b)),
precisely the two "authorities" directly involved in appellant's
detention and arrest. Both have explicit regulations respecting the
issue in this Writ. See also 8 C.F.R. § 236.1, both of the above reg-
ulations have been and are being ignored with apparent impunity,
and now, with judicial blessing in this Nation's courts.

The INS regulation specifically requires that "[e]very de-
tained alien **shall be notified** that he or she may communicate with

-48-

the consular or diplomatic officers of the country of his or her antionality in the United States." **8 C.F.R. § 236.1(e)** (emphasis upplied). The Department of Justice's regulation also requires that "[i]n every case in which a foreign national is arrested the arresting officer **shall** inform the foreign national that his consul will be advised of his arrest unless he does not wish such notification to be given." **28 C.F.R. § 50.5(1)** (emphasis supplied). Notwithstanding these regulations and their conceded violation by the detaining authorities, it appears that the courts are willing to carve out an exeption, where aliens are concerned, to the well-established rule which demands of the Government compliance with its own regulations. See, e.g., **Fort Stewart Schs. v. FLRA**, 495 U.S. 641, 645, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990) (citing **Vitarelli v. Seaton**, 359 U.S. 535, 547, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), and **Service v. Dulles**, 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957)).

## K. The Issue of Remedy

The courts of this Nation hold that even if an appellant/petitioner/detainee/prisoner has rights under Articles 36 and 35, he/she is not entitled to suppression of the wrongfully obtained evidence or dismissal of the indictment when the government violates those rights. Petitioner believes that whenever a court of the United States takes such a position, there is an inevitable erosion of the Judiciary as an institution. It is difficult to harmonize the principle of the rule of law with the granting of governmental immunity from the consequences of its violations of the Law.

The Courts' "no remedy" rational is based entirely on the conclusory assertion that " Article 36 of the Vienna Convention, and

the complementary Article 35 of the Bilateral Convention, do not create - explicitly or otherwise - fundamental rights on par with the rights to be free from unreasonable searches, the privileges against self-incrimination, or the right to counsel." Petitioner disagrees wholeheartedly with this view.

The courts have noted, that the exclusionary rule has been reserved for violations of fundamental rights such as those protected by the Fourth, Fifth, and Sixth Amendments. What the courts overlook is what makes these rights "fundamental". In Petitioner's view, these rights are considered fundamental not merely because they appear (along with others) in the Constitution, but because they are essential to the fair and efficient administration of this Country's justice system.

Underlying the Sixth Amendment right to counsel, for instance, is the recognition that the ordinary criminal defendant is unqualified and ill-prepard to navigate the intricacies of the U.S. legal system without assistance. As the Supreme Court stated in **Powell v. Alabama**, 287 U.S. 45, 68-69, 53 S.Ct. 55, 77 L.Ed. 158 (1932):

> Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he may be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

Quoted in **Gideon v. Wainwright,** 372 U.S. 335, 345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The Court has also recognized a right to counsel at the investigatory stage of criminal proceedings, based on the Fifth Amendment's protection against compelled self-incrimination. See **Miranda v. Arizona,** 384 U.S. 436, 470, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (noting that presence of counsel at interrogations can "mitigate dangers of untrustworthiness" and "help to guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial").

In Petitioner's view, the right to consular notification and access responds to the same basic concerns for fairness and efficient administration of justice as does the right to counsel. Petitioner in this case, was brought, through deception, to a place hundreds of miles away from his home. He was arrested and detained in a facility that had no windows to view the natural world outside, he was initially, for weeks on end, only allowed one 15 minute phone call every Sunday evening. He was housed with government informants whose concern was to find others to testify against so as to secure sentence reductions for themselves. Petitioner was given an inadequate diet. His every move and conversation was monitored, he was systematically drugged with a mind-numbing "mood elevator". Petitioner was forced, through government constructed circumstance, to hire a lawyer who was inexperienced and in the end proved extremely ineffective. Petitioner was forced to plead to quantities that never existed and finally Petitioner was punished more severely directly because of the place Petitioner was born.

It seems to Petitioner, under these circumstances, that

under these circumstances, that consular notification and access
are/were absolutely essential to the fair administration of the
United States' criminal justice system. Just as an effective law-
yer guides a criminal defendant through the unknown territory of
the justice system, diplomatic officials are often the only fam-
iliar face for detained nationals, and the best stewards to help
through the ordeal of criminal prosecution. A cosular official
could of helped in numerous ways in this instant case: (1) A Greek
consulate official could have helped Petitioner secure a competent
defense attorney who would have placed the burden of proof, at every
turn, where it belonged; on the government's shoulders. (2) A Greek
consulate official could have monitored the progress of the proceed-
ings and voiced concern at the restrictive, then exploitive, phone
regulations in Havana County jail. (3) A Greek consulate official
could have, and would have been there to question defense counsels
effectiveness when he made no effort to do a pretrial investigation;
(4) Petitioner's consulate would have been able to exercise their
right to ask the U.S. not to treat Petitioner different because
of the place of his birth...(5) Finally, a Greek consulate official
would have been there to protest Petitioner being offered to go to
trial in front of a racist judge and would have had the oppertunity
to officially protest, through the proper channels, Petitioner's
sentence which doubled, and in one case tripled, the sentences of
codefendants who were described by the government as leaders, mana-
gers, and organizers. Whether any of these protests would have re-
sulted in a different outcome, Petitioner has no doubt they would
have, is not the point; rights have been violated and the damage
has been extreme. The result is injury not only to the individual
Petitioner, but also the equity and efficacy of the United States'

criminal justice system.

Because Petitioner thinks rights to consular notification and access incorporated into domestic law by the Senate's ratification of the Vienna Convention and the Bilateral Convention are fundamental to the fair and efficient administration of America's justice system, Petitioner believes that a complete overturn of a conviction is not an inappropriate remedy, at least where petitioner can demonstrate prejudice from the violation of his treaty rights.

In summary: (1) The Vienna Convention and the Bilateral Treaty are self-executing treaties which clearly grant detained individuals rights that are enforceable by them in both international courts and courts of the United States of America; (2) Both the text and "legislative histories" of these treaties, as well as subsequent action of the U.S. authorities support these conclusions; (3) Petitioner has established that the authorities violated his rights under Articles 36 of the Vienna Convention and Article 35 of the Bilateral Treaty by failing to notify him of his right to consular assistance; (4) as a result of the violation of Petitioner's consular notification rights he sufferd U.S. Constitutionally guaranteed harms; (5) because these harms attack the very fabric of U.S. law, Petitioner sees no other remedy but to have his conviction set aside, and because of Legal Innocence and Actual Innocence, permanently overturned.

Petitioner believes that a decision contrary to the logic he offers is not only legally unsupportable, but also will serve to harm the credibility of the U.S. internationally; adversely affecting the rights of United States Citizens abroad.

## I. THE GOVERNMENT DID NOT PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE PETITIONER WAS A RISK OF FLIGHT. PETITIONER'S ATTORNEY DID NOT RAISE THE BAIL HEARING TO AN ADVERSARIAL LEVEL.

At Petitioner's Bail Hearing the Government claimed Petitioner presented a Risk of Flight on the basis of drug quantity and "because He (Petitioner) was born in Greece and Greece has no extradition with the United States". Petitioner's Attorney neither advised nor advocated on Petitioner's behalf. Petitioner came to the U.S. when He had just turned four (4) years old, in 1966; Petitioner went to school in the U.S., had family ties here, was raising children and had only left the U.S. in 1978, at the time He was sixteen (16), for a vacation that lasted two months. This vacation had occurred some twelve (12) years prior to the Bail Hearing. At this Hearing the Magistrate stated that the Petitioner had no children, no community ties and at the age of twenty-eight He should have started a family already. Petitioner's attorney never protested at a time when his advocacy was most needed. In **ATKINS v. PEOPLE OF STATE OF MICHIGAN,** 644 F.2d 543 (1981), the Court explained "The issue of whether the right to bail has been denied is collateral to and independent of the merits of the case pending against the detainee, and it is a right that, if not asserted immediately at the time it is infringed, is irremediably lost...The right to bail pending trial is a right that must be defended immediately if it is to be protected at all". In **UNITED v. SUPPA,** 799 **F.2d 155 (3rd. Cir. 1986)** The Court states that the "defendant may rebut presumption with testimony of co-workers, neighbors, family physician, friends and other associates attesting to defendant's character, health, or family situation". Petitioner's attorney, Larry Axelrood, never advised Petitioner, He only turned and said "You **are** a flight risk".

It became evident to Petitioner early on that his attorney was not going to challenge the government on anything they did. If not for the fact that Petitioner had no other recourse but to proceed with  his attorney or face the possibility of going unrepresented in the coming months, Petitioner would have certainly found himself other counsel, if not for the blatant violation of his Vienna convention on Consular Notification Rights. The absolute right to Consular Notification of Foreign Detainees has well been established in International Law. See the decision of the International Court of Justice (ICJ) in **Federal Republic of Germany v. United States (LaGrand)**, 2001 ICJ 104 (2001), which found that a non-citizen's arrestee's rights under **Article 36** are individual rights that cannot be procedurally defaulted in the U.S. or State Courts. The **ICJ** also held that prejudice need not be shown to show a violation of **Article 36**.

Petitioner's attorney had a responsibility to both advocate and advise Petitioner to the legal options available. Petitioner was never told that He had a right to have the Court review the Magistrate's Bail Denial, and to reconsider it, and " not simply defer to the judgement of the Magistrate's, but reach its own conclusion." **United States v. Leon**, 766 F.2d 77, 80 (2d Cir. 1985). Because there is a statutory presumption favoring release of the Defendant on his own personal recognizance or upon the execution of an unsecured appearance bond, the Government must prove, by a preponderance of the evidence, that the defendant presents a risk of flight. See 18 U.S.C. § 3142(b), **U.S. v. Berrios-Berrios,** 791 F.2d 246, 250 (2d Cir. 1986)(Bail Reform Act recognizes "traditional presumption favoring pretrial release" for most defendants.); See also **U.S. v. Khashoggi**, 717 F.Supp. 1048, 1051 -52 (S.D.N.Y. 1989)(holding wealthy foreign businessman with few ties to the U.S. did not pose risk of flight). Although Petitioner was

charged with a serious crime and faced a lengthy sentence, these two factors alone, however, did not support the Government's contention that He posed a risk of flight. See **U.S. v. Friedman,** 837 F.2d at 50 (refusing to find that seriousness of crime and length of potential sentence alone support risk of flight).

Accordingly, the Magistrate was prohibited from imposing an excessive bail resulting in the Petitioner's pre-trial detention. See **18 U.S.C. § 3142 (c)(2).** Detaining the Petitioner required that the Court issue written findings of fact as to its reasons for the detention and/or an explanation as to why a lesser bail amount will not guarantee the defendant's (Petitioner's) presence at trial. See **U.S.C. 3142 (i)(j).**

Petitioner believes that the only reason that the Government moved to deny him bond was because of his place of birth and that Country's extradition policy. "Pretrial detention provided for in the Bail Reform Act was intended to prevent flight and to protect safety of community, not to promote retribution, deterrence, or rehabilitation." **U.S. v. Botero,** S.D.Fla.604 F.Supp. 1028(1985).

The reason Petitioner hired an attorney was to have his rights protected. When Petitioner's attorney made no investigations, no objections to anything the Government said or did, the proceedings became a sort of minuet, where those invited to The Court began going through the prerehearsed dance steps of partners, rather than an ideological contest of adversarial quality. "The adversarial process protected by the Sixth Amendment requires that the accused have counsel acting in the role of an advocate, and the right to the effective assistance of counsel is thus the right of the accused to require the

prosecution's case to survive the crucible of meaningful adversarial testing..." **UNITED STATES v. CRONIC**, 466 US 648.

Many substantive due process violations occurred in the months that came after Petitioner's bail denial. As the Court observed in **FOUCHA v. LOUISIANA**, 504 U.S. 71, 112 S.CT. 1780, 118 L.Ed.2d 437 (1992): Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action. **YOUNGBERG v. ROMEO**, 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed. 2d 28 (1982). "It is clear that the commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."

The question now presented is whether, in light of the guarantee to substantive due process, did the Petitioner deserve to have a competent attorney by his side? Did Petitioner deserve to be made aware of his rights to consular notification, at a time when he was a pretrial detainee, unconvicted of the charges that had at the time been leveled against him by the government?

Substantive due process not only guarantees those rights specifically enumerated in the Constitution, but it is even broader, including what have sometimes referred to as the "fundamental" or "inalienable" rights of man. As Mr. Justice Goldberg noted in **GRISWOLD v. CONNECTICUT**, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed. 2d 510 (1965): "The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments...the concept of liberty protects

those personal rights that are fundamental, and is not confined to
specific tenets of the Bill of Rights...the Due Process Clause pro-
tects those liberties that are so rooted in the traditions and con-
science of our people as to be ranked as fundamental."

Petitioner was held for months in pretrial detention while his
american-born codefendants were given no-cash bonds. In fact, David
Karr, a major government informant, was out on bond for two years;
during this time he got married, fathered a child and was given all
the time he needed to put his affairs in order. In **U.S. v. GALLO,
653 F.Supp. 320, 334-35 (E.D.N.Y. 1986)** the Court made it clear that
"Under the due process clause of the Fifth Amendment a defendant may
not be punished prior to an adjudication of guilt conducted in acc-
ordance with due process of law".

While Petitioner's american-born codefendants (David Karr and
Bruce Adleman) were given immediate personal recognizance bonds, Peti-
tioner was taken to Havana County Jail in Havana Illinois. There Peti-
tioner was refused more than one phone call a week (every Sunday night)
for many weeks. There Petitioner was entombed in an enviroment that
disallowed natural sunlight because of its lack of windows; Petitioner
was housed with government informants, Petitioner was insidiously
drugged with the mind-numbing drug Zanax and forced to cope with the
lights on twenty-four hours in the day by taking Chlorohydrate. This
was done at a time when Petitioner was guaranteed by the Constitution
of the United States to be considered innocent. This was done at a
time when the **Vienna Convention** treaty the United States signed gave
Petitioner the right to call his consulate and complain about the
conditions of his confinement. In page 65 the circular the State

Department prints, titled: <u>CONSULAR NOTIFICATION AND ACCESS; INSTRUC-</u>
<u>TIONS FOR FEDERAL, STATE, AND LOCAL LAW ENFORCEMENT AND OTHER OFFIC-</u>
<u>IALS REGARDING FOREIGN NATIONALS IN THE UNITED STATES AND THE RIGHT</u>
<u>OF CONSULAR OFFICIALS TO ASSIST THEM</u>, it clearly states in page 22:

> A Consular Official may do a variety of things to assist a foreign national.
> The Consular Officer may speak with the detained foreign national over the
> phone and/or arrange one or more consular visits to meet with the detainee
> about his/her situation and needs. A Consular Officer may assist in arrang-
> ing legal representation, monitor the progress of the case, and seek to en-
> sure that the foreign national receives a fair trial(e.g. by working with
> detainee's lawyer, communicating with prosecutors, or observing the trial).
> The Consular Officer may speak with prison authorities about the detainee's
> conditions of confinement, and may bring...

This circular can be obtained in its entirety at: http://www.state.gov.
It clarifies many questions anyone interested might have. Petitioner
was handed this document for the first time, by an other inmate, after
Petitioner was incarcerated for ten-and-one-half years. This precluded
Petitioner from raising this issue at sentencing, appeal, or § 2255.
At no time prior to this late date did Petitioner know from anyone of
the existence of this precious individual right.

Petitioner feels that everyone involved with his detention and/or
the Court had an obligation to apprise Petitioner of his VCCR rights;
this includes his attorney, all county jail officers, the Sheriff of
Havana County (who by being an elected official took an oath to uphold
the laws of this land), all Marshals, Agents and anyone else who rep-
resented The Law. The mere fact that Petitioner was denied bond in
part because of his origin of birth dictates that notification of
Petitioner's Vienna Convention Rights were in order.

As VINSON,C.J., stated for the Court in **STACK v. BOYLE**, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed.3 (1951):

> "From the passage of the Judiciary Act of 1789, to the present***, federal law has unequivocally provided that a person arrested for a non-capital offense permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. *** Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.*** Honoring this presumption of innocence is often difficult; sometimes we must pay substantial social costs as a result of our commitment to the values we espouse. But at the end of the day the presumption of innocence protects the innocent; the shortcuts we take with those whom we believe to be guilty injure only those wrongfully accused and, ultimately, ourselves".

Petitioner had to endure pretrial detention in the most constricting atmosphere. He was subjected to loss of privacy in even the most basic sense. Petitioner was forced to eat, live, sleep, defecate and pray in the same constricting living space. Petitioner was housed with government informents who clung to his every word; then went to report to their masters fabricated stories that would ensure their ongoing cooperation netted them downward departures of the sentences. Petitioner for weeks was allowed only one phone call a week, for fifteen minutes every Sunday night. This forced Petitioner to hire an attorney that was more familiar with State Court proceedings rather than having an expertise in federal trial procedure. This attorney that Petitioner had to retain because of the Vienna Convention violation that was occurring, had represented Louis Isirov in prior criminal proceedings. The fact that Louis Isirov was a major government witness against Petitioner in the present charge is incarcerated for gave way for a conflict of interest. No one ever explained to Petitioner that Petitioner's attorney could be hesitant in preparing and eventually going to trial in Petitioner's behalf since he was forbidden by his previous attorney-client

to cross-examine, for impeachment purposes, his former client Louis Isirov. That is exactly what happened; Petitioner's attorney immediately advised Petitioner to "co-operate with the police", without ever doing an investigation into the validity of the charges. Meanwhile Petitioner's "American-Born" codefendants were allowed to have no-cash bonds and secure the representation they desired and were afforded the opportunity to communicate with their counsels without the county jail officials listening and tape recording their every word and legal strategy, unlike Petitioner.

After many weeks of pretrial confinement the Havana County Officials had phones installed that operated for collect calls only. While Petitioner's "American Born" codefendants were out on bond, Petitioner had to endure a cost of over thirty thousand dollars in collect phone bills. Petitioner was housed hundreds of miles away from the support of his loved ones, only by collect calls could Petitioner call his lawyer, console his aged and widowed mother, and say good-bye to the children he was raising. This Petitioner asserts was the beginning of Operant Conditioning inflicted upon him by the government to get Petitioner used to being treated different than his "American Born" codefendants. At no time in the three-hundred (300) days that Petitioner was confined in one county jail or an other did any representative of the government tell Petitioner of his Vienna Convention Rights on Consular Notification.

In **Miranda v. Arizona**, 384 US 709, the Court addresses the issue of constraint: "...The subject should be deprived of every psychological advantage. In his own home he may be more confident, indignant, or recalcitrant. He is keenly aware of his rights...Moreover his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law." This quote describes the overwhelming oppressive nature of isolating a person from the familiar outside world and the close support of his loved ones. This was true in 1966 when Miranda was decided, as it was true in 1990 when Petitioner was arbitrarily denied his due proce right of having a Bail Hearing that his attorney raised to an adversarial level; which Mr. Axelrood did not.

-61-

GOVERNMENT's FAILURE TO INFORM PETITIONER OF HIS VIENNA CONVENTION
RIGHTS ON CONSULAR NOTIFICATION CAUSED PETITIONER IRREVERSIBLE
HARM WHEN THE ATTORNEY HE WAS FORCED TO RETAIN GAVE PETITIONER
WRONG ADVISE AS TO PETITIONER RIGHTS ON CONTESTING DRUG AMOUNTS
IN PETITIONER'S PSI REPORT.

It is clear that a "rational penal system must have some
concern for the probable accuracy of its informational inputs in
the sentence process." **United States v. Weston**, 448 F.2d 626 (9th
Cir. 1971), cert. denied, 404 U.S. 1061 (1972). Thus, when a trial
court is confronted with inaccurate information in a presentence
report, and significantly relies on that misleading information in
formulating a sentence, the United States Supreme Court has held
that the sentence must be vacated and remanded for further proceed-
ings more consistent with notions of fairness and due process of law.
**Townsend v. Burke**, 334 U.S. 736 (1948); cf. **United States v. Lee**,
818 F.2d 1052 (2d Cir. 1987), cert. denied, 484 U.S. 956 (sentencing
court is required to assure itself that information upon which it
relies when fixing sentence is reliable and accurate).

A couple of days after entering Havana County Jail Petitioner
was visited by an officer of the probation department,
who wanted information as to the instant offense that petitioner is
incarcerated for. This Officer of The Court had an official respons-
ibility to inform Petitioner of his **VCCR Rights**; instead this officer,
either through deliberate indifference or just incompetence, began
interviewing Petitioner. What resulted was a Presentence Report that
was infused with exaggerated drug amounts. Even though Petitioner
was drugged by the Havana County officials with Zanax at the time,
he still was able to call his attorney and specifically tell him that
the first paragraph in the presentence report was completely without

merit. The first paragraph states that in the month of November
of the year 1989 David Karr purchased from Petitioner's home from
Louis Isirov six kilos of cocaine. Petitioner explained to his
attorney (via collect phone call) that it was impossible for that
amount of drugs to have been sold to David Karr in the month of
November or at any other time in the past. Petitioner's attorney
told Petitioner that it doesn't matter and his main concern was to
"cooperate with the authorities". Petitioner believes his attorney
had a responsibility to investigate the claims. See **Phillips v.
Mills**, 1999 U.S. App. LEXIS 20628 (6th Cir. Aug. 25. 1999 )(counsel
failed to conduct reasonably adequate investigation before advising
petitioner to plead guilty). Also see **Cronic, 466 U.S.** at **659:** If
counsel "entirely fails to subject the prosecution's case to meaning-
ful adversarial testing," the adversarial process itself becomes pre-
sumptively unreliable. Petitioner's Due Process rights were violated
when his attorney never bothered to investigate this first paragraph
in Petitioner's presentence report. Meanwhile Petitioner's codefendant
and confidential informant, Louis Isirov was telling authorities the
same thing. See **U.S v. Isirov, 986 F.2d 183 (7th Cir. 1993)**(Isirov
claimed in his appeal that the amounts of drugs that David Karr claim-
ed to have bought were false. The court responded with the evidence
being looked at "in the light most favorable to the prosecution"").
Petitioner doesn't understand this reasoning, was the prosecution
there? Louis Isirov was "fronting" David Karr drugs at fourteen
hudred dollars an ounce. At six kilos in the month of November (minus
the fifty-five ounces that were originally seized by police at the
beginning of "Operation Springfield") that is $(6 \times 35 ) - 55 = 155 \times 1400$
$ 223,200.00 that David Karr either received or was owed just during
the months of November 1989 to the date of his arrest. This does not

include all the drugs that David Karr sold for Louis Isirov through Bruce Adleman. Petitioner's attorney had a responsibility first to tell Petitioner about his Vienna Convention Rights (because attorney was an officer of the court and a representative of one part of the United States Judicial Process) and second Petitioner's attorney had absolute responsibility to formally request all Brady material such as, any and all records and/or information which arguably could be helpful to the defense in impeaching or otherwise detracting from the probative force of the Government's evidence or which arguably could lead to such records or information. See **Brady v. Maryland**, 373 U.S. 85 **(1963)**. Also see **United States v. Bernal-Obeso**, 989 F.2d 331 (**9th Cir. 1993**). (Prosecutors and investigators must turn over to the defense all material information casting a shadow on a government witnesse's credibility). The  Petitioner's attorney had an obligation to conduct a thorough investigation into all allegations; just as the Government had an institutional obligation to disclose any and all considerations which is held out to a witness or which the witness subjectively hopes for and anticipates since such consideration dir- ectly gives rise to the inference of bias or interest. See generally, **United States v. Mayer**, 556 F.2d 245, 248 (**5th Cir. 1977**). In addition to promises of considerations which might promote a witness' coopera- tion with the Government, Petitioner was entitled to be advised of any matter which might cause a witness to color his testimony in favor of the Government out of fear or interest in self-preservation. E.g., **United States v. Sutton**, 542, F.2d 1239 (**4th Cir. 1976**). If the Government has available information which may lead to proof of prior inconsistent statements or other evidence helpful to the accused, fun- damental fairness requires that it be turned over to the defense.

The United States supreme Court has held that the Government
has an ongoing obligation to turn over evidence which is favorable to
he accused. **Pennsylvania v. Ritchie**, 480 U.S. 49 (1987). Petitioner's
attorney had an obligation to formally request all exculpatory material
and the Government had the same level of obligation to hand this mater-
ial over. See **United States v. Moore**, 949 F.2d 68 (2d Cir. 1991).

When Petitioner was given his presentence report, Petitioner
specifically told his attorney, Larry Axelrood, that the claims in the
first paragraph were exagerated. The  attorney's response was that it
didn't matter because in the end all that mattered was the amount of
cooperation that was given to law enforcement personal in the appre-
hension of other law-breakers. Petitioner was at that time drugged
with Zanax, had no other attorney to call and ask for advise, was feel-
ing the effects of the reprehensible conditions of the Havana County
jail (the poor diet, the constant invasion of privacy, the tape recorded
phone calls, the drugging, the lack of contact with those Petitioner
loved...). Had Petitioner known about his **International Rights on
Consular Notification**, Petitioner would have asked for help from his
embassy. The next paragraph that Petitioner would like to object to in his pre-
sentence report is the last paragraph. In it it states that Petitioner
and Louis Isirov were caught in a car with 1800 grams of substance.
The government didn't even have the honesty to call it what it was; some
1800 grams of a counterfeit substance that tested a " possible weak
positive". In between the first paragraph and the last paragraph are
many numbered sections in which drug sales between Louis Isirove, Bruce
Adleman and David Karr are given at specific times and in specific
weights. In fact all the sales that Petitioner was charged with but
never alledged to have been there by the Government (under the conspir-
acy rules) totaling  close to an additional 6 kilos. The Government

never claims that petitioner was present at those alleged drug sales. These six kilos represent at least 6 x 30,000 = \$180,000 of sales for Louis Isirov. Part of these proceeds went into Louis' pockets and part of these monies went to Louis Isirov's supplier. How could anyone logically expect or advise Petitioner to plead guilty to these amounts without a thorough pretrial investigation? Petitioner was never there in most of the alleged drug deals in "Operation Springfield", how could Petitioner plead guilty to all elements of the charged crime? See **U.S. v. Trevino**, 131 F.3d 1140, 1141 (5th Cir. 1997) and **U.S. v. Faulks**, 143 F.3d 133, 138-139 (3d. Cir. 1998 ). These statements that Petitioner was forced to plead guilty to, were given by people who were in a desperate need to receive a "substantial assistance time cut". Without a competent attorney by his side Petitioner was placed in a position that compromised his Vienna Convention rights, his Due Process rights, his 5th Amendment rights and his 6th Amendment rights. Petitioner will tackle these arguments in a little while; for now, Petitioner claims he had the right to know everything about the conspiracy he was charged with. Who not only sold to whom, but also what each individual claims they did with their money. The rational in this is quite simple; it is very easy to agree to cooperate with the government in the prosecution of other people, once someone is caught and facing imminent jail time. It is also very easy to make up exaggerated amounts so as to vilify the next hapless sap and make oneself seem a much more needed asset. What's not so easy is to pass the crucible of critical inspection; when members of a conspiracy are arrested and separated, do their stories match? If so then what they say must be the truth, since they never had a chance to collaborate their accounts of past events. What happens then when their stories do not match on certain important particulars? Doesn't a defense attorney have the

obligation to his client to investigate all inconsistencies in the statements of the Government's witnesses? When Petitioner was never apprised that the Government's chief witness, David Karr, was being called a liar by everybody he was setting up, all considerations of Due Process were arbitrarily shredded in the name of expediency. Each "credible" government witness had made an agreement not to minimize, not to maximize and not to falsify any part of their admissions. This in turn thrusts the responsibility on the Government's shoulders not to pretend a witness has maintained credibility when in fact their records show a pattern of both questionable "truths" and outright lies. When the government's witness, Louis Isirov, claimed that David Karr was fabricating many kilos of supposed sales (see **U.S. v. Isirov 986 F.2d 183(7th Cir. 1993)**) Petitioner had a right to know. When David Karr used verbal techniques of deception to entrap dozens of people, Petitioner had a right to know the individual circumstances of each act of betrayal including all instances where David Karr's "credibility" was put to the question either by the Government or the Defendants that he help indict. This is the fundamental right of any person entering an adversarial process. The right to impeach a defendant's accusers is so ingrained in this Nations Constitution that petitioner feels he need not go more into this at this time. Suffice it to say that when Petitioner's Vienna Convention rights were violated this caused Petitioner to hire an attorney that was more of a friend to the Prosecution rather than an adversary. When Petitioner's attorney failed to do the proper (or any ) pretrial investigation, this compromised Petitioner's ability to prepare for either trial, or even the Sentencing Hearing that no one ever told Petitioner he had a right to have.

These Due Process violations and Sixth Amendment violations led Petitioner to have to testify on himself in direct violation of his Fifth Amendment right against self incrimination by being forced to plead guilty. This is not to mention Petitioner's absolute right to make a knowing plea as to all the elements of the offense.

If there is any doubt as to Petitioner's allegations all the government has to do is produce all the proffers of the government's witnesses in "Operation Springfield". Petitioner requested this exculpatory information back in the early 1990's through the Freedom of Information Act. After three years of waiting all Petitioner received was all the Rule 35 downward departures of his codefendants along with some small insight into a lie detector test that David Karr had submitted to in response to an impeachment allegation. If the Government had enough doubt to question David Karr's credibility, and force him into a lie detector test for about 29 ounces of cocaine, then wouldn't it seem questionable that the Government didn't question him on the other quantities? And if they did, didn't Petitioner have a right to view this potentially impeachable evidence? Petitioner will submit, if the Court so Orders all the papers in his possession that he received from his F.O.I.A. request. As for all his codefendants proffers, the Supreme Court held that the Constitution requires the government to preserve evidence "that might be expected to possess an exculpatory value that was apparent before the evidence was destroyed," and "be of such nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." **California v. Trombetta**, 467 U.S. 479, 488, 489 (1984).

Petitioner believes that he had the right to know, not only, how many kilos the government claims that Louis Isirov sold, but also, who

the government received this information from, if Louis Isirov agreed
with this amount, what he did with his portion of the money, who his
supposed supplier was, how much money did he give him, does his supplier
agree that these monetary amounts and drug amounts are correct and if
not, to any of the above questions, why the government did not do a
more thorough investigation to find the real truth. These questions
are a necessity when considering witness credibility. The absence of
intelligent questions can only bring the shadow of doubt upon the
shoulders of both the prosecution and the defense lawyers involved.

Petitioner believes that the same questions that should have
been posed to Louis Isirove should have been brought to every "credible"
government witness in the conspiracy. The reasoning behind this is
obvious; it is quite easy to fabricate drug quantities when it means
that this action will lead to a reduced sentence of imprisonment. Only
if there is truly vigilant guard at the gates of criminal investigations
can manifest injustices be stopped and prevented from going unnoticed.
In this case every "credible" government witness called every other
"credible" government witness a liar. How could Petitioner be expected
to enter into trial or make an intelligent plea, without this inform-
ation? It was at that time and in those specific circumstances that
the government's pledge to honesty can be objectively viewed.

Louis Isirov was the ring-leader of "Operation Springfield",
he was charged with selling 13-plus kilos of cocaine. Once arrested
he in turn offered to cooperate with authorities in the apprehension
of others; it was at this time that the government had an absolute
responsibility to ensure that Louis Isirov did not fabricate any part
of his proffer. It was also the responsibility of all the defense
attorneys  to seek this information out, under the Rules of Discovery.

Petitioner believes he deserved to be made aware and

to have an attorney that was at least willing to discuss viable Disc-. overy concerns. Petitioner was never present at many of the alleged drug deals, how can anyone from the government or even his own Defense attorney ask Petitioner to plead guilty to those amounts on just pure faith? It would be a fallacy to assume that Petitioner could make an intelligent plea without an independent investigation of the statements made by all persons involved in "Operation Springfield.

   This same rational goes to Petitioner's codefendant, Bruce Adelman, did Bruce admit to all the drug quantities that the government, through their "Confidential Informant" David Karr, attributed to him; or did he just plead guilt to all the government's claims so that he can jump on the bandwagon to help himself receive a time reduction by helping convict someone else? Only Bruce Adleman's proffer can tell us if Bruce Adleman just acquiesced to the drug amounts that he was charged with out of fear and coercion or if these amounts were accurate.

   Petitioner believes that his charges have vastly grave implications; in that if brought to the fore would prove a tremendous fraud perpetrated upon the Court by the government. If indeed every "credible" government witness was calling every other "credible" government witness a liar, then all these guilty pleas were coerced, not given intelligently, and not investigated properly. This resembles more of actions committed in Stalin's Purges, were prosecutor and defense counsel were on the same side, rather than the adversarial system of a country of truly free people. Petitioner charges the government of withholding exculpatory information in its possession that Petitioner could have used to impeach the governments "credible" witnesses and brought the weights of the drugs he was charged with from five-to-fifteen kilos,

to one-to-five kilos; thus reducing the amount of time he was exposed to. Petitioner charges the government of withholding, thus depriving him of his international rights to consular notification, this led to a chain of events that made a mockery of Petitioner's Fifth Amendment, Sixth Amendment, Eighth Amendment, and Fourteenth Amendment Rights. Petitioner charges the government with deliberately confining him in a torturous environment so as to effectively cut Petitioner off of the outside world and humiliate, terrify, drug, and psychologically damage him so as to be able to mold him into an acquiescing zombie. Petitioner charges the government with deliberately intruding upon him "credible government witnesses" that at least one of (Louis Isirov) wanted Petitioner to bring false statements against a slew of other people so that Petitioner and Louis Isirov would be allowed to "go home years earlier" than expected. Petitioner charges the government with cutting off Petitioner's avenues as to address the issue of Louis Isirov trying to falsify past events to fill his Machiavellian need for self-preservation; leading to other human beings being exposed to false statements brought against them with no effective way to impeach their false accuser. Petitioner charges the government with forcing him in a situation that caused his capacity to become so diminished that it has taken Petitioner many years to recover from the majority of the damage. Petitioner charges the government along with Havvana County jail officials of colluding to deprive Petitioner the chance to obtain a fair trial. Petitioner charges the government of undermining the Authority of the Office of the President and the Authority of the Legislature of the United States of America by ignoring the mandated rights of Petitioner under an American signed treaty; thus turning the Word of the Nation into nothing more than the carefully packaged wares of a deceitful merchant. Petitioner charges the govern-

ment with directly causing him to enter a guilty plea that was not intelligently given, coerced, and fraudulent. Petitioner charges the government with exposure to racial prejudice that was so pervasive in the Court that the sentencing Judge couldn't refrain from commenting on Petitioner's diversity of citizenship, "You came to this country and broke the law", [Petitioner came to the U.S. when he was four years old, in 1966]. Petitioner charges the government with willful intent to deprive him of the"Liberty"and the"Pursuit of Happiness" that the United States Constitution guarantees. Petitioner charges the government with violating the public trust by being the most lenient on the most culpable of the defendants in this conspiracy...

**N. PETITIONER'S DUE PROCESS RIGHTS AS GUARANTEED BY THE FIFTH AMENDMENT WERE VIOLATED BY THE GOVERNMENT'S FAILURE TO DISCLOSE INFORMATION PERTAINING TO WITNESSES THAT RECEIVED ANY THING IN EXCHANGE FOR THEIR TESTIMONY.**

---

Brady v. Maryland, 373 U.S. 83 (1963), requires that the government disclose evidence favorable to the accused. To establish a Brady violation, a defendant must prove: (1) that the evidence was favorable to him because it was exculpatory or impeaching; (2) that the evidence was suppressed by the government, either willfully or inadvertently; and (3) that the evidence was material and, therefore, that the failure to disclose it was prejudicial. **Bradley v. Nagle**, 212 F.3d 559, 566 (11th Cir. 2000), cert. denied, 531 U.S. 1128 (2001). Under Brady, excluded evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." **Bayley**, 473 U.S. 667, 682 (1985). The materiality inquiry should be applied to the "suppressed evidence considered collectively, not item-by-item." **Kyles v. Whitley**, 514 U.S. 419, 435 (1995). Further, a defendant need not prove that it is more likely than not that he would have received a different verdict with the allegedly withheld evidence, "but

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 434

The above being the case, the government was required to disclose what witnesses had received anything in exchange for their statements and they were precluded from testifying against Petitioner. **18 U.S.C. § 201** et seq.

It is common knowledge that the Tenth Circuit in its decision of **U.S. v. Brewster,** 408 U.S. 501, 506 (1972), where the Supreme Court made the profound announcement, which applies to the present case with undeniable force:

> Section 201 applies to "public officials", and that term is defined explicitly to include Members of Congress as well as other employees and officers of the United States.

Id. at 506.

The government is an employee and/or officer of the United States. Therefore, Section 201 et seq. does apply and thus, the government by operation of procedure and law under § 201 was forbidden to utilize and/or call persons to testify against Petitioner that received "anything" in exchange for such information.

Research in over 200 decisions that followed the Singleton decision fail to recognize the Supreme Court's announcement in Brewster. And, a review of Singleton's actual briefs presented to the Supreme Court never referenced Brewster. The Court should take judicial notice that when the Tenth Circuit Singleton decision was taken to the Supreme Court on a petition for a writ of certiorari, failure to mention Brewster was, in part, one of the Supreme Court's reasons to hear the case, not to mention the fact that the Supreme court was not inclined to overturn Brewster.

The above being the case, Petitioner had a right to full disclosure from the government of what witnesses had received something of value for their testimony. The denial of such Brady material deprived Petitioner due process of law and a chance at a fair trial in violation of the Sixth Amendment through the Due Process Clause.

O. **THE GOVERNMENT GAVE THEIR CHEIF WITNESS A LICENSE
TO LIE AND DISTORT THE TRUTH SO HE CAN OBTAIN AS
MANY CONVICTIONS THROUGH SUBTERFUGE AS POSSIBLE
AND THUS MAKING IT IMPOSSIBLE FOR PETITIONER TO
HAVE A CHANCE AT A FAIR TRIAL WHILE USING THE
"PREPONDERANCE OF THE EVIDENCE IN THE LIGHT
MOST FAVORABLE TO THE PROSECUTION" STANDARD**

The government through their agent Kelly Cain gave their
chief government witness a licence to lie. In taped phone record-
ings David Karr was allowed to not only to pretend to be something
he was not (anytime someone assumes the role of an undercover inform-
ant, artifice and deceit are a part of his work-tools) but also he
was allowed to lie continuously without restraint. In the Discovery
Papers that Petitioner's counsel had (that Petitioner did not view
until a year after his Guilty Plea) David Karr had made tape-recorded
conversations entrapping Louis Isirov, Bruce Adelman and a slew of
other people. He not only misrepresented during these conversations
his intent (which under the circumstances is questionably understand-
able) but also began to weave tales about things that had nothing to
do with obtaining drugs. This is while Agent Kelly Cain was sitting
next to David Karr for both supervision and support.

Any time the government gives an informant a license to lie
the question arises, when does the lying stop? What distinguishes
a credible government witness who is given permission from the gov-
ernment to lie and a government witness who is not credible? Peti-
tioner feels the to attempt to distinguish the two is/wouldbe a
mockery on the rational of the Court and anyone else trying to make
sense of the governments criteria for credibility.

Add to the above argument that the Court had in the early 1990's an absolute right to give its witnesses a very wide breadth of freedoms and insentives, now add to that the pre-<u>Apprendi</u> reasoning of the "preponderence of the evidence in the light most favorable to the prosecution" standard, see <u>**U.S. v. Isirov,**</u> 986 F.2d 183 (7th Cir 1993), and you have not only a costitutional violation of the guarantee to a fair trial but also, if their is a violation to the guarantee to a fair trial then everything that happens up to that point (and afterwards) is open to speculation of cruel and unusual punishment. To assume that it is justifiable to detain a person and subject him to the conditions of county jails like Havana, allow the government's chief witness to run around free to get married, free to act as an undercover-agent only serves to examplify the twisted view of Justice in the Judge Richard Mills' Court. This is not an isolated instance of abuse of discretion where everyone who were officers of the court acted in a synchronized fashion to give its informants insentives that are calibrated to cause harm, constitutionally to the defendents and to the public reputation of the court. See <u>**U.S. v. Williams**</u>, 81 F.3d 1434 (7th Cir. 1996).

> "...let us see whether Judge Mills can be said to have been acting unreasonably when he held that the defendants in this case had not been denied a fair trial by the totality of the government's misconduct. The misconduct arose out of the abnormal, and deeply questionable, generosity and solicitude that the government displayed towards its key witnesses...The government knew that some of these witnesses were lying when they testified...the government, as one dimension of its friendly treatment of these witnesses, allowed "contact visits" with members of their families, the witnesses obtained drugs while in jail-even dealt drugs-as the government well knew. Knew, but made no effort to correct the witnesses' lying denials to the jury. And members of the prosecutorial team gave presents to the witnesses... allowed conjugal visits in the prosecutor's offices, and even threw parties for the witnesses. None of these favors was disclosed to the defense, even though they could have been used to impeach the witnesses' credibility. "

Given Judge Mill's ability to justify anything that the government sees fit to do or offer its witnesses, one has to wonder just how far is too far?

TO REITERATE, Petitioner believes that when the government gave permission to its witnesses to lie, when the government made it all but impossible for Petitioner to find a lawyer who was not in collaboration with the the power that be, when the government withheld <u>Brady</u> material from Petitioner, when the government subjected Petitioner to systematic drugging, and government brought charges against Petitioner in Judge Mill's court it violated Petitioner's right to a fair trial. It violated Petitioner's due process rights, Sixth Amendment rights to effective assistance and not to mention the most misunderstood right in this country today: Petitioner's absolute right to a Consular Presence at every stage of the obscene mockery Petitioner was subjected to.

## P. PETITIONER': GUILTY PLEA WAS A DIRECT RESULT OF TRAUMA PRODUCED DELIBERATELY BY THE GOVERNMENT AND THEREFORE UNCONSTITUTIONALLY OBTAINED.

Petitioner again would like to remind the Court that every allegation he has lodged against the government and its officers only stems from his Vienna Convention violation of Consular Notification. Without this abuse, Petitioner's argument would have to stand on the prudence of current United States domestic law alone.

Being that the violating was International in nature and also being that Petitioner is to be deported in the near future, he believes his arguments and complaints should be given the multidimensional consideration they deserve in the light most favorable to International Law and with respect to the International Community in general.

A guilty plea is **not** a constitutionally acceptable basis for a con-
viction unless that plea is "voluntary." This voluntariness requir-
ement has been imposed pursuant to the due process clause. It has
been likened by the Court to the prohibition against admission of
involuntary confessions, **Waley v. Johnston (1942)**, although its
content also is shaped in part by the traditional "knowing and
intelligent" standard for waivers of trial rights, **Boykin v. Ala.
(1969)**. In **Brady v. U.S. (1970)**, the Supreme Court noted that "the
standard as to voluntariness of guilty pleas must be essentially
that defined by * * * [a leading lower court opinion]:'[A] plea of
guilty entered by one fully aware of the direct consequences, in-
cluding the actual value of any commitments made to him by the court,
prosecutor, or his own counsel, must stand unless induced by threats
(or promises to discontinue improper harassment), misrepresentation
(including unfulfilled or unfulfillable promises), or perhaps by
promises that are by their nature improper as having no proper rela-
tionship to the prosecutor's business (e.g., bribes).'" Petitioner
has every reason to believe that the whole approach of arresting
people and punishing them for taking their case to trial, to be
unconstitutional, and morally reprehensible. In the same breath
Petitioner highly doubts the lawfulness of offering leniency to
criminal defendants to "cooperate and help law enforcement find
other law-breakers". To offer inducements of leniency for acts of
aid is tantamount to a well established and highly visible bribery
scheme. See **UNITED STATES v. DANIEL B. BREWSTER**, 408 US 501, 33 LEd 2d
507, 92 S Ct. 2531. "...based on 18 USC § 201, a bribery statute.
[408 US 506] Section 201 applies to "public officials," and that
term is defined explicitly to include Members of Congress as well

as other employees and officers of the United States. Subsections
(c)(1) and (g) prohibit the accepting of a bribe in return for
being influenced in or performing an official act...". At no time
did any of Petitioner's codefendants act in any other way other
than the self-serving method of helping the government entrap, and
provide testimony to the detriment of others so they [Petitioner's
codefendants] could receive the fulfillment of the government's
promise of carefully weighed leniency. For every conviction that
the government secures because of assistance payment is promised,
secured and rendered. At no time did Petitioner face any evidence
against him that was not collected by the dubious means of unlawfull
promises and inducements offered in direct contrast to the Supreme
Court's decision in **Brewster**.

The voluntariness requirement imposes a duty upon the trial
judge to ensure that the guilty plea is made knowingly and without
coercion. Even though the Court has emphasized that the scope of
that duty, like the definition of voluntariness itself, is governed
by constitutional standards; Petitioner contends that in the present
way things are conducted in district courts, it makes any question
of "voluntariness and without coercion" an out-and-out mockery.
Petitioner was facing the possibility of going to trial after he
was detained for many months in extremely harsh conditions, he was
denied natural sunlight, his every phone call cost $1.00 a minute,
his every call was monitored and recorded, he was drugged daily,
he was confined in living quarters with people who had offered and
hoped to testify for the government against Petitioner, he was,
through restrictive phone use, to rely on an attorney who came into
the case with a conflict of interest, who made not the slightest
pretrial investigation, who never even questioned Petitioner's

naturalization. Petitioner was torn away from the support and care of his family, he was fed a substandard diet, he was deliberately denied consular notification... Finally after many months of this type of deliberate disregard he was handcuffed and shackled then brought in front of the "Honorable Judge Mills", who has a public reputation of making disparaging remarks from the Bench at foreigners. And who also almost always makes his decisions to favor the government.

With an unlimited supply of witnesses at its disposal, the government gave Petitioner only two very clear choices; to go to trial with an attorney whose abilities Petitioner had no confidence in, and to face witnesses that were trying to earn back the years of their lives the government had promised to take away from them, or to go to plead guilty to charges that were untrue and gathered in an unlawful manner.

By pleading guilty Petitioner saved himself a possible life sentence at the hands of not seekers of justice but collectors of guilty pleas and creators and dispensers of trauma and human despair.

There was nothing voluntary about the conditions that Petitioner found himself in. There was nothing knowingly given, when Petitioner's own lawyer never bothered to ask for Brady material or to even explain to Petitioner that the Court had stripped him of the rights that his American citizenship gave him.

When the question of fairness in a trial scheme is arbitrarily dismissed, then one can only conclude that injustice shall, at the end of the day, prevail.

Petitioner believes that the place of his birth had a devastating effect on his treatment during pre-trial detention, during his sentencing and all through his 12 years and 2 months of incarceration.

Petitioner still doesn't understand what exactly were the elements of the crime he plead guilty to. Was it the 13.6 kilograms of cocaine that David Karr maintained was the absolute truth until the government impeached him at his Sentencing Hearing? Was it the some 6 odd kilograms that Louis Isirove claims were the only weights involved in the whole conspiracy, or was it the elements of the offense that Petitioner only admitted to?

Petitioner doesn't understand how the government is allowed to threaten, bribe and manipulate witnesses, and the courts then allow their testimony to be used " in the light most favorable to the prosecution".

In **Boykin v. Alabama** (1969) the Court stated that a guilty plea should be "...intelligent and voluntary". Moreover, **N.C. v. Alford** (1970) later suggested that the state could also establish a knowing waiver by counsel's testimony in a subsequent proceeding that counsel had fully informed defendant of the rights relinquished by pleading guilty.

Just as the Sixth Amendment requires effective assistance of counsel, due process requires an impartial judge. The guiding standard on judicial bias is "likelihood or appearance of bias" rather than "proof of actual bias." **Taylor v. Hayes** (1974).

The Supreme Court has held that a defendant has "the due process right not to be sentenced on the basis of materially untrue information," **Townsend v. Burke** (1948). When one of the government's main witnesses (Louis Isirov) claimed that the other of the government's main witness (David Karr) lied about the drug quantities, how did the government resolve this issue? Especially when Petitioner and many other defendants were claiming that David Karr was exaggerating ? When David Karr was given a lie detector test why was it on lesser quantities and why was Petitioner never informed or his defense counsel never asked ? These are questions that are irrevocably entwined with the question of an intelligently given guilty plea.

In **Chapman v. California**, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), it was noted that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." Included in this category are: violation of the right before an impartial judge, **Tumey v. Ohio**, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); ineffective assistance claims based on presumed prejudice, i.e., conflict of interest, **Holloway v. Arkansas**, 435 U.S. 475, 98 S.Ct. 1173 (1978); and racial discrimination in selecting a grand jury, **Rose v. Mitchell**, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), Petitioner highly doubts there was one Greek citizen in the grand jury that indicted him.

Q. PETITIONER'S SENTENCE MUST BE SET ASIDE AS IT IS IN VIOLATION OF THE TEACHINGS OF APPRENDI v. NEW JERSEY, AND, THE SIXTH AND FIFTH AMENDMENTS OF THE CONSTITUTION OF THE UNITED STATES.

---

In **U.S. v. Barbosa**, 271 F.3d 438, 452 (3rd Cir. 2001), the Third Circuit recognized that the Supreme Court when deciding Apprendi v. New Jersey, 530 U.S. 466 (2000), declared two constitutional rules, which were, (1) "[O]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proven beyond a reasonable doubt", and, (2) "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." Id. 271 F.3d at 452.

In the present case, Petitioner argues that the second core holding announced by Apprendi applies to his case with undeniable force.

### PRELIMINARY STATEMENT ON APPRENDI

As a preliminary matter, Petitioner states that Apprendi is not only the first interpretation of 21 U.S.C. § 841, but, in addition to effecting the sentencing schemes under statue, it also equally effects the sentencing scheme under the U.S. Guidelines, as established below. Additionally, Apprendi is also retroactive to cases on collateral review.

-81-

## APPRENDI APPLIES TO THE U.S. GUIDELINES

In U.S. v. Williams, 235 F.3d 858 (2000) the Third Circuit was presented with Apprendi and the U.S. Guidelines. On appeal, two issues were raised: (1) "whether the Supreme Court intended Apprendi to apply to cases in which the trial judge decides a fact that increases a defendant's sentence under the sentencing Guidelines, but the sentence imposed does not exceed the statutory maximum; and (2) whether the Supreme Court intended Apprendi to apply to cases in which judicial fact finding increases the possible sentence to be received above the statutory maximum, but the actual sentence is below the statutory maximum." Id. 235 F.3d at 860 - 61.

Williams was arrested and named in a Five Count Indictment, charging him with "conspiracy to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 18 U.S.C. § 2." Id. 235 F.3d at 859. At the time of his arrest, a search of an apartment revealed 239.4 grams of heroin and 311.2 grams of cocaine. Id. at 859. Williams entered into a plea agreement with the Government. The terms of the agreement specified that Williams could plead guilty to Count Seven, and that all remaining Counts would be dismissed, and that he would face up to 20 years. Id. at 859. The Government and Williams also stipulated that the amount of heroin involved was approximately 67.2 grams and that his base offense level would be 22, but then reduced by 3-levels for acceptance of responsibility, for a total offense level of 19. Id. 859.

A Pre-Sentence Report (PSR) was prepared after Williams pled guilty to Count Seven. Id. 235 F.3d at 859 - 60. The PSR recommended that 361 grams of heroin and 311.12 grams of cocaine be applied to

-82-

Williams for sentencing purposes. Id. at 860. The PSR then calcu-
lated williams base offense level at 28, converting the amounts of
heroin and cocaine into equivalent total amount of marijuana and
applying the Drug Quantity Table in U.S.S.G. § 2D1.1(c). Id. at 860.
The PSR then subtracted 3-points for acceptance of responsibility,
leaving Williams' a total of 6-criminal history points, placing
him category III. The PSR specified that the maximum term of im-
prisonment was 20 years. 21 U.S.C. § 841(b)(1)(C). The PSR stated
that the guideline range was, based on level 25, category III, 70
to 87 months. Id. at 860. At sentencing the district court adopted
the PSR's findings and imposed a sentence of 85 months incarcera-
tion. Id. at 860.

On appeal, the Third Circuit analyzed the two core holdings
announced by Apprendi in relation to what effect, if any, it would
have in a situation like Williams, who was, before any applications
of the guidelines, was not facing a statutory sentence that exceeded
the statutory maximum under 21 U.S.C. § 841(b)(1)(C), and the possi-
ble effects the new rules would have on the guidelines. Id. at 860-65.

The Court found that because Williams received a guideline
sentence that was below the statutory maximum of § 841(b)(1)(C),
(20-years) that the first new constitutional rule announced by the Supreme
Court in Apprendi did not apply. Id. 235 F.3d at 862-63.

The Third Circuit Court of Appeals then turned to the second
new costitutional rule and/or core holding announced by Apprendi
to see what, if any, impact it would have on the Guidelines. Id. at
863-65. In doing so, it analyzed both core holdings together and
stated:

-83-

The Court in Apprendi characterized the constitutional rule as: "'[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.'" (internal citations omitted). The Court also stated that "'" any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proved beyond a reasonable doubt.'" (internal citations omitted). By those formulations, it could be argued that the Apprendi rule does apply to Williams, because the district Court's finding increased the "prescribed range of penalties" and "maximum penalty" to which Williams was exposed, even though his actual penalty did not exceed 20 years.

However, as discussed earlier, the Court stated in Apprendi "we should be clear that nothing in this history suggests that it is impermissable for judges to exercise discretion - taking into consideration various factors relating both to offense and offender - in imposing a judgement within the range prescribed by statute." (internal citations omitted). This statement suggests that a District Court's sentence that is under the statutory maximum cannot be constitutionally objectionable under Apprendi.

Despite the ambiguity in Apprendi, we hold that it does not apply to Williams' sentence for several reasons.

Id. 235 F.3d at 863.

The Court then went on to list its reasons as to why Apprendi did not apply to Williams, stating that: (1) "the sentence actually imposed (seven years and one month) was well under the original statutory maximum of 20 years", (2) the "20 year maximum sentence was confirmed several times in the course of Williams' plea and sentence... Williams' application to enter a guilty plea stated that he understood that the maximum punishment under law for his offense was 20-years in prison", (3) "based on the amount of drugs that the District Court found attributable to Williams, it would not be possible for the District Court to sentence Williams to a sentence exceeding 20-years under the Sentencing Guidelines," (4) "the District Court's finding that the drugs in the...apartment were attributable to Williams for sentencing purposes could be characterized as a finding of relevant conduct under the Sentencing Guidelines.

...Therefore, if the District Court found that the drugs in the...
apartment were attributable to Williams as relevant conduct, the
finding would affect the sentencing range under the Sentencing
Guidelines but would not affect the range under the statute," and
(5) "at the sentencing hearing, the District Court expressedn dis-
satisfaction with the low criminal history category assigned to
Williams and indicated that the Court had discretion to depart up-
wards under U.S.S.G. § 4A1.3.

...In Stating that an upward departure might be appropriate but
that the range of 70 to 87 months was sufficient, the District Court
suggested that Williams' criminal history contributed to the sentence
of 85 months. The fact that an upward departure from a lower sentence
range would likely be within the District Court's discretion based
on Williams' lengthy criminal history lends further support to our
decision not to vacate the sentence on Apprendi grounds." Id. 235
F.3d at 862.

In the present case, Petitioner unlike Williams, does not
challenge the discretionary portions of the guidelines that a senten-
cing judge can consider when imposing a sentence under the guide-
lines, but rather, Petitioner, Petitioner argues that there are
"facts" that must be proved beyond a reasonable doubt, as required
by Apprendi's second core holding before any set of prescribed senten-
cing ranges under the guidelines can be applied to a defendant, like
Petitioner, who is sentenced under the Guidelines. This issue is a
novel issue that has not as of this date been squarely addressed by
any Circuit or District Court - but it is one - that should not be
ignored as it deals with concerns of constitutional protections that
a criminally accused defendant, like Petitioner, possesses under the

Constitution, which should be addressed by this Court.

First, Petitioner points out the first of many oversights made by the Williams' Court. The Williams' Court stated:

> Initially, we hold that Apprendi does not apply to the increase in Williams' sentence under the Sentencing Guidelines. Apprendi did not directly address this issue, because it concerned a sentence under state law. With regard to the Sentencing Guidelines, the Court stated: "The Guidelines are of, course, not before the court. We therefore express no view on the subject beyond what this Court has already held."

Id. 235 F.3d at 862.

With that, the Williams Court initially concluded that Apprendi was not meant to be applied to the U.S. Guidelines.

However, it should be noted that before and after the Williams decision was handed down, the Supreme Court, after Apprendi was decided, granted certiorari in some forty cases in which the circuit court approved Guideline sentence increases based not on jury verdicts but on a judge's findings by a preponderance of evidence. The Supreme Court vacated the circuit court judgements, and remanded for further consideration in light of Apprendi.

The Supreme Court's decisions making these remands indicates clearly that the reasoning of the Apprendi opinion is not to be restricted to instances where the sentence enhancement will cause a sentence to exceed the statutory maximum. In many of the drug cases remanded the judges imposed sentences that did not exceed the maximum fixed in the statute.

A representative sample of the twenty-six drug cases remanded includes cases where the quantity of drugs, the defendant's managerial role in a conspiracy, or possession of a firearm were "sentencing factors" found by a district judge by the preponderance of the evidence. See, e.g., **U.S. v. Thomas**, 204 F.3d 381 (2nd Cir. 2000), cert. granted, _____U.S._____, 121 S.Ct. 756 148 L.Ed.2d 659 (2001); **U.S. v. Hardin,**

209 F.3d 652 (7th Cir. 2000), <u>cert. granted</u>, _____U.S._____, 121 S.Ct. 1071, 148

L.Ed.2d 659 (2001); **U.S. v. Valensia**, 222 F.3d 1173 (9th Cir. 2000), <u>cert.</u>

<u>granted</u>, _____U.S._____, 121 S.Ct. 1222, 149 L.Ed.2d 133 (2001); **U.S. v. Brown**,

217 F.3d 247 (5th Cir. 2000), <u>cert, granted</u>, _____U.S._____, 121 S.Ct. 1072, 148

L.Ed.2d 950 (2001); **U.S. v. Jackson**, 213 F.3d 1269 (10th Cir. 2000), <u>cert.</u>

<u>granted</u>, _____U.S._____, 121 S.Ct. 621, 148 L.Ed.2d 531 (2000); **U.S. v. Hester**,

199 F.3d 1287 (11th Cir. 2000); <u>cert. granted</u>, _____U.S._____, 121 S.Ct. 336,

148 L.Ed.2d 270 (2000); **U.S. v. Steyskal**, 221 F.3d 1345 (8th Cir. 2000), <u>cert.</u>

<u>granted</u>, _____U.S._____, 121 S.Ct. 852, 148 L.Ed.2d 767 (2001).

Petitioner avers that all the above remands undermine all the

reasons the <u>Williams</u> Court relied upon to hold that <u>Apprendi</u> does

not apply to the Guidelines. If the Supreme Court did not intend for

<u>Apprendi</u> to apply to the Guidelines even when the guideline sentence

imposed does not exceed the statutory maximum, then the Court would

not have granted writs of certiorari, vacated the sentences, and re-

manded the cases for further consideration in light of <u>Apprendi</u>.

Moreover, Petitioner avers that many courts have rendered decisions

on <u>Apprendi</u> have taken out of context the language of in <u>Apprendi</u>

that any fact "that increases the penalty for a crime beyond the

prescribed statutory maximum must be submitted to a jury, and proved

beyond a reasonable doubt," and, have overlooked, when considering

the guidelines, the second core holding announced by <u>Apprendi</u>,"[I]t

is unconstitutional for a legislature to remove from the jury the

assessment of [facts[ that [increase the prescribed range of penalties]

to which the criminal defendant is exposed."

The Third Circuit, however, has recognized that <u>Apprendi</u> did

announce two new constitutional rules. **U.S. v. Barbosa**, 271 F.3d 438,

452 (3rd Cir. 2001)("Under these newly announced rule[s]...").

In conducting further research into the ocean of cases that

-87-

have come down dealing with the application of Apprendi two things
became obvious, which is probably why courts have shunned away from
applying Apprendi to the guidelines. Those are: (1) Most of the courts
have only focused on the first constitutional rule announced by Appren-
di , and in so doing, have disregarded the plain and unambiguous
language of the second new constitutional rule, which does not ref-
erence "statutory maximums" which are only found under "penal statues",
but rather, it references "prescribed range of penalties" which is
precisely what the Guideline Sentencing Grid contains; and (2) Most
of the courts have read out of their decisions, when declining to
apply Apprendi to the guidelines, **McMillan v. Pennsylvania,** 477 U.S.
79 (1986), a decision that dealt with "sentencing factors" and distinguished those
factors from "elements", and those courts that have referenced McMillan
have failed to appreciate it's teachings in conjuction with the
teachings of Apprendi with respect to Apprendi's second core hold-
ing and to consider how the two teachings taken together effect the
application of the guidelines and what penalties under the guidelines
are permissible under the preponderance of the evidence standard,
found by a judge, and those that cannot be applied until a petit
jury has assessed facts that must be proved beyond a peasonable doubt.

In the present case, Petitioner's contentions bring together
both teachings of McMillan and Apprendi.


### Apprendi And McMillan

Apprendi announced two new constitutional rules. **Barbosa,** 271
F.3d at 452. The first, "other than the fact of a prior conviction,
any [fact] that increases the penalty for a crime beyond the pre-
scribed statutory maximum must be submitted to a jury, and proved

beyond a reasonable doubt." Apprendi, 530 U.S. at 490. The second, "it is unconstitutional for a legislature to remove from a jury the assessment of [facts] that increase the prescribed range of penalties to which a criminal defendant is exposed." Id.

Both of these core holdings require that [facts] that can increase a penalty [must] be found by a petit jury before the increased penalty can be applied to a criminally charged defendant. However, it is clear that the first core holding pertains to "statutory maximums" and the other deals with penalties that can be imposed other than "statutory maximums". Moreover, it should not be overlooked that in Apprendi when the Supreme Court referred to [facts] it was meaning "elements of a statute that must be proved beyond a reasonable doubt.

In contrast, the Supreme Court in McMillan defined "sentencing factors" to be something different from "elements", and in doing so, made clear that "sentencing factors" are something that do not need to be found by a jury. Id. 477 U.S. at 85 - 86.

Therefore, taking the two landmark decisions together, it becomes obvious that under the guidelines, chapters One, Three, Four, and Five, which allow for decreases and increases in a base offense level prescribed by chapter Two of the guidelines are "sentencing factors" within the meaning of McMillan.

Under Apprendi, however, drug amounts and types are "elements" which are "facts" that must be found by a jury before the appropriate and/or correct base offense level under chapter Two, § 2D1.1(c) "Drug Table" and "Drug Equivalency Table" can be determined. Failure to submit weights or types to a jury and prove them beyond a reasonable doubt, before a "prescribed penalty" under the guideline sentencing

grid can be imposed, subjects a criminally charged defendant to
a sentence not supported by facts to justify the sentence imposed.

This being the case, Apprendi and McMillan split the U.S.
Guidelines into two parts. The first, leaving the discretion to
a sentencing court to consider all "sentencing factors" for increa-
ses and decreases enumerated under Chapters One, Two (in part - 2A1.1 -
2A6.1; 2B1.1 - 2B6.1; 2C1.1 - 2C1.7; 2D1.1(a) - (b); 2D1.2 - 2X5.1),
Three, Four, and Five, and under Apprendi the "elements" of a statute
must be satisfied before a base offense level can be prescribed
under Chapter Two, section 2D1.1(c), because the section is effected
by the "elements" contained under 21 U.S.C. § 841(b).

## Application Of Apprendi And McMillan To The Present Case

As previously noted, the one of the core holdings, the one
that applies to the case at bar with undeniable force, is that "it
is unconstitutional for a legislature to remove from the jury the
assessment of facts that increase the prescribed range of penalties
to which a criminal defendant is exposed." Perforce, Petitioner was
entitled to such procedures and/or process as the Fifth and Sixth
Amendments, as well as the Due Process, may require in connection
with criminal prosecutions. See Apprendi. see also, **U.S. v. Henry**,
282 F.3d 242, 251 (3rd Cir. 2002) ("In Apprendi, the Supreme Court
recognized a new constitutional right grounded in the Due Process
Clause and Sixth Amendment's notice and jury trial guarantees.);
**U.S. v. Tran**, _____ F.3d ____ , 2000 U.S. LEXIS 29030 (2nd Cir. 2000)

("to comport with the Fifth and Sixth Amendments, a criminal indict-
ment must (1) contain all of the elements of the offense so as to
fairly inform the defendant of the charges against him, and (2) en-
able the defendant to plead double jeopardy in defense of future
prosecutions for the same offense.").

       In the present case, Petitioner was charged with a single
Count of Conspiracy to Distribute cocaine. On     ,   , 1991, Judge
Richard   . Mills (U.S.D.J.), applying the preponderance of the
evidence standard, found that Petitioner was responsible for the
distribution of five to fifteen kilograms of cocaine in the conspi-
racy. Petitioner only plead guilty to these quantities after : (1)
the Government neglected to advise Petitioner of his Vienna Conven-
tion Rights; (2) Petitioner was forced to accept the services of
an attorney who specialized in state law and who did not raise the
proceedings to an aversarial level; (3) Petitioner was denied bond
and had his American Citizenship arbitrarily striped; (4) was con-
fined for many months in conditions that were designed to cause
psychological torment and despair; (5) was subjected to "controlled
starvation"; (6) was systematically drugged with mood altering,
mind numbing drugs to counter the effects of the government-induced
confinement; (7) was torn away from the people he most loved and
the children he had bonded with; (8) was threatened, coerced, and
tricked into believing that there were no legal points of argument
by both Petitioner's attorney and the Government; (9) was for months
confined with informants that were acting as government agents and
who were given promises of rewards to help the government achieve
convictions; (10) was denied access to a pretrial investigation
that would have revealed that all the major government informants
had impeached themselves in one way or an other.

The determination made by Judge Mills, under the prepon-
derance of the evidence standard that Petitioner was responsible
for five to fifteen kilograms of cocaine, was not a "sentencing
factor" that <u>McMillan</u> authorizes to be determined by a judge,
but rather, it is a "fact" that had to be assessed by a petit
jury, as required by <u>Apprendi's</u> second core holding and the fail-
ure to submit this fact to the jury violated that core holding;
"it is unconstitutional for a legislature to remove from the jury
the assessment of facts that increase the prescribed range of pen-
alties to which a criminal defendant is exposed," and Petitioner's
Fifth and Sixth Amendments.

According to <u>Apprendi's</u> second core holding, because the
Sentencing Guideline Grid carries numerous "prescribed range penal-
ties", the weight of the drugs had to be proved to a petit jury
beyond a reasonable doubt to ensure that a sentencing range is the
correct range to be applied. To do any less violates due process
and Petitioner's Sixth Amendment. The sentence absent an assessment
by a jury is unconstitutional.


### Remedy

The question framed then, is what is the relief and/or
remedy to which Petitioner is now entitled. To answer this question,
a court should consider how a remedy has been reached when a vio-
lation of <u>Apprendi's</u> first core holding takes place. As clearly
laid out in <b><u>U.S. v. Henry</u></b>, 282 F.3d 242 (3rd Cir. 2002), the Court
analyzed various default statue provisions and found that when a
sentence exceeds the statutory maximum of the default statute
(applicable to the case) that the sentence must be vacated and the

defendant resentenced to no more than the applicable statutory default penalty to the circumstances of the case.

However, Apprendi's second core holding does not reference "Statutory maximums" but it only references "penalty ranges".

Like the Henry Court said, the only "penalty that can be imposed on a defendant when drug identity is not known or found by a jury is one-year, the lowest statutory maximum under the catch-all provision of § 841". Id. 282 F.3d 244. The Court noted the same concerning when quantity is not found by a jury. Id. at 247.

In Petitioner's case, like Henry's, it involved a confidential informant that was a known drug dealer and user of the same kind of drug Petitioner was alleged to have distributed. Because Petitioner never admitted to the specific drug quantities he was charged with, and furthermore, the government withheld exculpatory evidence that could have been used to impeach its "credible" witnesses; a jury was never called to assess any facts nor did the Government prove any facts (i.e., weight of drugs distributed) Petitioner contends in the strongest possible terms that, in similar manner to how a violation of Apprendi's first core holding that for a violation of the second core holding, the lowest prescribed penalty range must be applied.

Under the Guidelines there are (14) fourteen provisions that apply to various "Conspiracy" offenses. Those respectively are found under §§ 2D1.2; 2D1.5; 2D1.6; 2D1.7; 2D1.8; 2D1.9; 2D1.10; 2D1.11; 2D1.12; 2D1.13; 2D2.1; 2D2.2; 2D3.1; 2D3.2.

The only provision that applies to the type of conspiracy Petitioner was involved is § 2D2.1. That provides:

**§ 2D2.1   Unlawful Possession; Attempt or Conspiracy**

(a) Base Offense Level:

(1) 8, if the sustance is heroin or any schedule I or II opiate, an analogue of these, or cocaine base; or

(2) 6, if the substance is cocaine, LSD, or PCP; or

(3) 4, if the substance is any other controlled substance.

Cocaine falls under 2D2.1(a)(2), which prescribes a level of 6.

Eventhough, this instant case before the Court is a Mandatory Minimum case, before the Government could have sought a Statutory punishment, under the second new constitutional rule decided by the Supreme Court in Apprendi;, (it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed) they must prove the amounts involved attributable to a defendant is sufficient enough to trigger the mandatory minimum contained in the Penal Statutes. Otherwise, failure to prove such amounts must subject the case, for sentencing purposes to the Guidelines.

Additionally, without any reliable indicia facts to establish amounts, then the lowest catch - all guideline provision that correponds to the offense must be used.

The Rule of Lenity supports interpretation making drug identity and drug quantity elements of the offense. **Bifulco vs. United States**, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed2d 205 (1980). If there is any lingering doubt about whether drug quantity is an element or a sentencing factor, the Court is supposed to apply the most restrictive interpretation and regard identity and quantity as elements of the offense.

In this case, a Federal Grand Jury returned a single count Indictment, that charged Petitioner, Louis Isirov, David Karr, Bruce Adelman and a half-dozen other coconspirators with Conspiracy to Distribute Cocaine under 21 U.S.C. § 846.

Among the numerous paragraphs of information alledged, paragraph # 23 of Petitioner's P.S.I. states that between November 1989 to approximately February, 1990, Louis Isirov sold a total amount of six kilograms of cocaine. The paragraph goes on to state that David Karr would travel to Petitioner's residence to obtain said drugs. Upon reading this paragraph, Petitioner immediately informed his attorney that the quantities described were false. Meanwhile Louis Isirov was making the same statements to his lawyer. In paragraph # 22 it states: "Isirov fronted Adelman approximately twenty ounces of cocaine in January, 1989. From January, 1989, through March, 1989, Karr would obtain four ounces of cocaine on a weekly basis from Adelman. The following week, Karr would pay Adelman $4,000 to cover the previous week's purchase and receive an additinal four ounces..." Petitioner's name does not appear in this, or any but three paragraphs in the P.S.I., Petitioner was never told that the quantity of drugs in the offense was an element of the offense.

Instead, Mr. Koukoulomates' sentence was determined by the sentencing judge while his defense lawyer never bothered to object to the sentencing factors driving the sentencing determination. At sentencing defense counsel never bothered to object to the presentence report, which computed the sentencing guideline range as if Mr. Koukoulomates was involved with 13.4 kilograms of cocaine.

Parenthetically, the computation is not consistent with

USSG 2D1.1, Note 12. Even if one accepts every statement of quantity as true in Petitioner's PSI; the last transaction completed was Louis Isirov's final delivery of one (1) kilogram of cocaine, this is what he discussed and pretended to sell, not the 1800 grams that Petitioner and all his codefendants were charged with. The fact that the package mostly consisted of a counterfeit substance and was soaked with Dr. Pepper® , does not negate the intent of USSG 2D1.1,Note 12. Petitioner never discussed or ever admitted to prior knowledge of that last transaction.

At sentencing, the district court adopted the computations in the PSI and came to the conclusion that Petitioner was involved with 13.4 kilograms of cocaine.

Accordingly, Petitioner has spent 12 years in prison for a quantity of drugs that was never submitted to a jury.

The failure to submit to the jury the quantity of drugs, the essential fact driving the sentencing calculation, denies due process of the law and denies the right to trial by jury.

Denial of due process of law and the right to a trial by jury is a fundamental defect resulting in a complete miscarriage of justice hat cannot be waived. See **United States v. Maybeck**, 23 F.3d 888 (4th Cir. 1994). See also **Murray vs. Carrier**, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), **Engle vs. Isaac**, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), **Jones vs. Arkansas**, supra.

**THE SENTENCING GUIDELINE REGIME IS UNCONSTITUTIONAL BECAUSE THE GUIDELINES ARE AMBIGUOUS, AND THEREFORE, IN VIOLATION OF THE SENTENCING REFORM ACT ["SRA"]**

**CERTAIN GUIDELINES VIOLATE THE SRA**

28 U.S.C. 994(a) authorizes the United States Sentencing Commission [hereinafter called the "Commission"][1] to promulgate and modify sentencing guidelines based on the following factors:

**(1)** the grade of the offense;

**(2)** the circumstances under which the offense was committed which mitigate or aggravate the seriousness of the offense;

**(3)** the nature and degree of harm caused by the offense, including whether it involved property, a person, a number of persons, a breach of public trust;

**(4)** the community view of the gravity of the offense;

**(5)** the public concern generated by the offense;

**(6)** the deterrent effect a particular sentence may have on the offense by others; and

**(7)** the current incidence of the offense in the community and in the Nation as a whole.

28 U.S.C. 994(f) states that the Commission, in promulgating guidelines, shall adhere to the requirements of 28 U.S.C. 991(b) (1)(B) for "providing certainty and fairness in sentencing and reducing unwarranted sentence disparities."

28 U.S.C. 991(b)(1)(B) states that the Commission shall promulgate guidelines to ensure fairness in sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct.

---

[1]   28 U.S.C. 991 (a) states United States Sentencing Commission shall consist of seven voting members and one non-voting member. Voting members are appointed by the President with the advice and consent of the Senate.

The Sentencing Reform Act spells out in excruciating detail a vision for the Sentencing Commission. Yet, the Commission has promulgated and continues to promulgate ambiguous and confusing sentencing guidelines that aggravate the sentencing disparities the Commission was supposed to eliminate.

For example, USSG 3B1.1 is the guideline for role in the offense. In **Jones vs. United States**, 161 F3d 397, 403 (6th Cir. 1998), the court described 3B.1 as ambiguous. The court stated that a criminal defendant should not be subjected to additional punishment because of an ambiguous guideline.

Another example is USSG 2D1.1, Note 12. In **United States vs. Marmolejos**, 140 F3d 688 (3rd Cir. 1998), the court discussed the ambiguous nature of Section 2D1,1,Note 12. The court said:

> There is no bright line for determining whether an amendment to the Guidelines clarifies the existing law; these categories are unclear and, as is usually the case, there are factors supporting either side.

In **United States vs. Felix**, 87 F3d 1057 (9th Cir. 1996), the court said,

> until Application Note 12 was amended, the appropriate weight of drugs to consider in a completed transaction was ambiguous, a court might sentence on the amount under negotiation or the amount delivered.

One would think the Commission would respond by using its power under 28 U.S.C. 994(s). Instead, the Commission promotes disparate sentencing practices by refusing to apply 28 U.S.C. 994(s), which provides:

> (s) The Commission shall give due consideration to any petition filed by a defendant requesting modification of the guidelines utilized in the sentencing of such defendant, on the basis of changed circumstances unrelated to the defendant, including changes in-

(1) the community view of the gravity of the offense;

(2) the public concern generated by the offense; and

(3) the deterrent effect particular sentences may

have on the commission of the offense by others.

Despite the statutory mandate, the Commission has no procedure in place for evaluating a petition for reduction of the sentencing guidelines. The absence of a procedure for equalizing sentences for similarly situated offenders denies due process, and violates the constitutional provision against cruel and unusual punishment. The refusal to make all clarifying amendments retrocative violates due process and the enabling statue.

The predictable outcome is the promotion of disparate sentencing practices in violation of the SRA.

The sentencing guidelines, as applied generally, and as applied to Petitioner violate the enabling statue, and are unconstitutional.

"...our federal courts, manipulation of the U.S. Sentencing Guidelines has the consequence of imposing savage sentences upon those who request the jury trial guaranteed them under the United States Constitution, 500% longer than sentences received by those who plead guilty..." **Berthoff v. U.S.**, 140 F.Supp.2d 50 (D.Mass. 2001) "Small wonder that the rate of criminal jury trial in federal courts is plummeting. Id. at 69 n.34.

Because Petitioner's Vienna Convention violation has led to many constitutional violations including Petitioner's 5th Amendment right to due process, his 6th Amendment  right to effective assistance, his 8th Amendment right not to be given excessive bail, his 14th Amendment right not to be treated as anything else but a naturalized citizen, and numerous other International Human Rights

-99-

and U.S. Constitutional rights violations, Petitioner believes
that this Court should consider heavily the claims set forth in
this Writ of § 2241.

## CONCLUSION

Premises considered, based upon the foregoing statements, representations, and authorities above, Petitioner asks this Court to set his conviction aside.

RESPECTFULLY SUBMITTED,

DEMETRIOS KOUKOULOMATES
REG.NO.: 08916-026
LOW SECURITY CORRECTIONAL INSTITUTION
POST OFFICE BOX 1000
WHITE DEER, PA 17887

## VERIFICATION

Petitioner hereby attests under penalties of perjury, that the foregoing representations, are true, correct, and complete, to the best of his knowledge, recollection, and belief, and have been made in good faith.

RESPECTFULL SUBMITTED,

DEMETRIOS KOUKOULOMATES

# PROOF OF SERVICE

I, the undersigned, hereby certify that on January
28, 2003, I mailed a copy of the foregoing WRIR OF HABEAS CORPUS
§ 2241                 , via first-class postage

prepaid and mailed to:

> **CLERK OF COURT**
> **UNITED STATES DISTRICT COURT** for the
> **MIDDLE DISTRICT OF PENNSYLVANIA**
> **POST OFFICE BOX 1148**
> **SCRANTON, PA 18501-1148**

# PROOF OF SERVICE FOR INSTITUTIONALIZED OR INCARCERATED LITIGANTS

I further certify that this document was given to pri-
son officials on JANUARY 28TH 2003, by depositing it
in the institutional legal mailbox system for forwarding
to the above listed address. I further certify under the
penalty of perjury that the foregoing is true, correct,
and complete. 28 U.S.C. § 1746.

_____
Signature

Dated: 1-25-03

# 3: CV 03 0186

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

Voucher No. _Well 11_

## Request for Withdrawal of Inmate's Personal Funds

Allenwood  P.c. Box 1000  White Deer, PA 17887              1-7-03
<sub>(Name of Institution and Location)</sub>                                          <sub>(Date)</sub>

Please charge to my account the sum of

| 5 | 00 |
|---|---|
| Dollars | Cents |

. . . and authorize the same to

be paid to: Clerk of Court                     P.o. Box 1148
<sub>(Payee)</sub>                                          <sub>(Street Address)</sub>

Scranton        PA        18501-1148              Filing Fee
<sub>(City)</sub>          <sub>(State)</sub>          <sub>(Zip)</sub>                    <sub>(Purpose)</sub>

The inmate's personal account
has been charged in the              Dorota Kakalauta              C5916-026
amount indicated above              <sub>(Signature of Inmate)</sub>              <sub>(Register No.)</sub>

MA 1/9/03
<sub>(Commissary Clerk)</sub>                                          <sub>(Approving Official)</sub>

Paid by cash on _____, 19___ ,_____

ISP LVN                         <sub>Previous editions not usable</sub>        <sub>(Payee's Signature)</sub>        BP-199(45)
                                **INMATES DUPLICATE COPY**                        October 1979